[No. S029476. May 11, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DELMER BOYER, Defendant and Appellant.

418

## COUNSEL

R. Clayton Seaman, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez, Frederick B. Clark, Teresa Torreblanca, William M. Wood, Adrianne S. Denault and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—In 1984, a jury convicted defendant Richard Delmer Boyer of the first degree murders (Pen. Code, §§ 187, subd. (a), 189)[1] and robberies (§ 211) of Francis and Aileen Harbitz. An allegation that defendant used a deadly weapon, a knife, in each of the offenses was sustained. (§ 12022, former subd. (b), see now subd. (b)(1).) Under the 1978 death penalty law, special circumstances of multiple murder (§ 190.2, subd. (a)(3)), and robbery murder (*id.*, former subd. (a)(17)(i), see now subd. (a)(17)(A)) were found true.[2] After a penalty trial, the jury sentenced defendant to death.

We reversed the 1984 guilt and penalty judgments. We concluded that defendant's confession to the police in a custodial setting was obtained in violation of the Fourth Amendment and *Miranda v. Arizona* (1968) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], and that admission of the confession in evidence at his trial was prejudicial on the issue of guilt. However, on the record before us, we saw no basis to conclude that other evidence admitted against him was tainted by the Fourth Amendment and *Miranda* violations, such that it could not be used in any retrial. (*People v. Boyer* (1989) 48 Cal.3d 247 [256 Cal.Rptr. 96, 768 P.2d 610] (*Boyer I*).)

After a retrial, in which defendant's confession was not admitted, a jury again found defendant guilty of the robberies and first degree murders of the

---

[1] All further unlabeled statutory references are to the Penal Code.

[2] It was necessary to retry the guilt and special circumstance issues after the original guilt jury could not reach a verdict, resulting in a mistrial.

Harbitzes. A knife-use allegation was again sustained for each crime. The jury found true, as special circumstances, that each murder was committed in the course of a robbery, and that defendant was convicted of more than one murder in the proceeding. Pursuant to the jury's penalty verdict, defendant was again sentenced to death.

This appeal is automatic. We will affirm the guilt and penalty judgments in full.

## I. GUILT PHASE EVIDENCE

### A. *Prosecution case.*

In December 1982, retirees Francis Harbitz, age 68, and his wife Aileen Harbitz, age 69,[3] were stabbed to death in their Fullerton home. Their bodies were discovered in the late evening of December 12, 1982, by their son William, who came to check on them after attempts to reach them by telephone during that day had failed. William had last seen and spoken to his parents on December 5, 1982.

A friend of Aileen's had telephoned once on the evening of December 7, and several times on the morning of December 8, but got no answer. Later on December 8, the friend went to the Harbitz residence, knocked, got no response, and slipped a note under the door. Papers with handwriting were found on the floor inside the front door on the night of December 12.

When William entered the house, he found Francis's body sitting upright against a bloody hallway wall. Aileen's was lying, surrounded by blood, on the floor of the living room. Francis had sustained some 24 stab wounds to his neck, upper and lower chest, and back. Three of his ribs were fractured by a knife entering his back, and he also suffered a broken arm. One of the neck wounds severed his left carotid artery. Three chest wounds penetrated his heart, and one of these also cut his ascending aorta. Francis bled to death from the wounds to his heart and aorta. Aileen suffered 19 stab wounds to her neck, chest, abdomen, and back. One abdominal entry wound transected her left lung four times, indicating the assailant repeatedly withdrew the knife and reinserted it in the same track. A wound beneath her left ear penetrated to her spine. One of the chest wounds transected her ascending aorta. She bled to death as a result.

At the crime scene, a purse found in the kitchen contained no wallet. Later, at the crime lab, two $50 bills were found folded inside a smaller container at

---

[3] In *Boyer I*, we mistakenly spelled this victim's first name "Eileen." (*Boyer I, supra,* 48 Cal.3d 247, 256.)

the bottom of this purse. A second purse, found in a back bedroom, contained a total of $40 in cash. In Francis's bedroom, a wallet in a dresser drawer contained approximately $260 in cash. The premises showed no signs of forced entry or ransacking.

On the night William discovered his parents' bodies, he mentioned defendant's name to the police. William had met defendant three years earlier, when defendant lived near William and his wife in a Fullerton apartment complex known as the International Hotel. William introduced defendant to his parents, and defendant had done yard work for the senior Harbitzes. Defendant's relationship with the victims was cordial, and they had lent him money. According to William, defendant wore a "standard buck knife" in a sheath on his belt "all the time."

William had recently moved from the International Hotel, without telling defendant, but had kept his old telephone number. William had not seen defendant for six months to a year. During this period, defendant had called three times, though William did not speak to him personally. Defendant telephoned William again on December 8, 1982, at which time they engaged in small talk.

On December 14, 1982, police searched the El Monte residence defendant shared with his girlfriend, Cynthia Cornwell. Items retrieved from the premises included a pair of Levi's, a buck knife, and a sheath. The burned remnants of a jacket were found in a hibachi on the kitchen stove of the El Monte house. At some point, police also recovered Aileen's wallet from a sewer.

The Levi's had a hole in the left knee and also contained three bloodstains. One stain, near the hole, was consistent with defendant's blood, but not with the victims'. A second stain was consistent with Francis's blood, but not with Aileen's or defendant's. A third stain was consistent with Aileen's blood, but not with Francis's or defendant's. The buck knife had a spot of human blood, but the sample was too small to analyze for identity. The victims' wounds could have been inflicted with the buck knife, but not with a kitchen knife found on a counter in the Harbitzes' home.

John Kennedy testified under a grant of immunity as follows: In December 1982, he lived in Temple City, near El Monte. On December 7, 1982, Kennedy, driving his mother's car, arrived at the El Monte house shared by defendant and Cornwell between 4:30 and 5:00 p.m. Defendant asked for a ride to his parents' house so he could pick up money his father had received for selling one of his guns. After 45 minutes or so, they departed. It was beginning to get dark. Defendant was walking and talking normally. He was wearing a blue jacket.

Kennedy drove. They first stopped to buy a quarter-gram of cocaine from a dealer Kennedy knew, with $25 Kennedy had borrowed from his brother for that purpose. They injected the cocaine. Typically, a cocaine injection produced a five-minute "rush" and a one-hour "high."

After they injected the cocaine, defendant directed Kennedy on a 10-minute drive to defendant's parents' house. Kennedy stayed in the car. Defendant went inside for 15 minutes. He returned with a tire and a foam mattress and said his father had given him a check.

Next, defendant directed Kennedy a short distance to an apartment complex, where defendant tried and failed to obtain a marijuana cigarette. Defendant then had Kennedy drive to the International Hotel in Fullerton to find "Bill." This trip took about 20 minutes. When they arrived, both men went to an apartment door, and defendant knocked. A young woman answered and said no Bill lived there.

Remarking that Bill must have moved back with his parents, defendant told Kennedy to drive to another location. Defendant first suggested they were headed to "some dope dealer's house," but when they arrived at their destination—three or four miles from the International Hotel—defendant said he was going "to Bill's parents' house." Darkness had fallen. Defendant directed Kennedy where to park. Kennedy remained in the car. Defendant got out, walked around a corner, and disappeared from view. He was acting normally.

After 45 minutes, defendant returned. He seemed to be walking normally, and was carrying a towel. At that moment, a patrol vehicle with red lights on its roof approached. Defendant walked to the back of Kennedy's car and began wiping the rear window with the towel. After the patrol car passed, defendant got in and instructed Kennedy "to take off calmly, not to attract any attention."

Kennedy did not know where they were, but, following defendant's directions, he drove back to the freeway. Defendant was "talk[ing] okay." As they drove, Kennedy saw defendant apply the towel to his left knee. Defendant referred to "dope dealers that don't have no dope," and said "that he had to hurt 'em." Defendant indicated he himself had been stabbed.

Once they were on the freeway, Kennedy saw defendant going through two wallets. Defendant said he needed to find a bushy area beside the freeway. As they passed such an area, between the Durfee and Peck Road offramps of Interstate 10 near El Monte, defendant threw out one of the wallets. He discarded the second wallet in "a gutter, a sewer" beside the Temple City Boulevard offramp. He instructed Kennedy not to tell anybody what had happened that night.

When they arrived back at the El Monte house, Kennedy saw the stab wound in defendant's knee. Defendant and Cornwell went into the bathroom to tend the wound. At the house, Kennedy noticed defendant was wearing his buck knife in a sheath on his waist. Before leaving, Kennedy saw this knife lying on a dresser, blade open. There was blood on the knife.

To Kennedy's knowledge, defendant injected cocaine three or four times a week. Kennedy had, on occasion, seen defendant smoke phencyclidine (PCP) and marijuana, and had observed him ingest cocaine and alcohol in combination.[4]

Cynthia Cornwell testified under a grant of immunity as follows: In December 1982, she, defendant, and her three children were living in a house on Gibson Street in El Monte. Defendant and she were boyfriend and girlfriend. Cornwell's welfare check had been substantially cut when defendant moved in. They were extremely poor and needed money for "everything."

On the afternoon of December 7, 1982, Kennedy came to the house. Sometime thereafter, Kennedy and defendant left together. Defendant was wearing a blue jacket. Before departing, he said he was going to try to borrow money from his parents. He asked Cornwell for $30, which she knew was the price of cocaine. There was no money to give him.

When defendant and Kennedy returned, defendant was limping, and there was blood on his knee. Cornwell asked where defendant had gone, what had happened, and whether he had gotten any money. Defendant answered that he got no money; he had "tried going to a loan shark and got in an argument with him, and that's what happened to his knee." Defendant gave Cornwell $10. The two went into the bathroom, where Cornwell tended defendant's wound.

Before the police came to the house, but on the same day, defendant asked Cornwell whether she would wait for him if something happened. Defendant then got a telephone call from his mother, which seemed to upset him. When Cornwell asked what was wrong, defendant said "something about a murder" and told Cornwell "you are going to hate me."

That evening, after defendant left the El Monte house with the police, Cornwell burned defendant's blue jacket in a hibachi on top of the kitchen

---

[4] With respect to Kennedy, the parties stipulated that (1) in his police interviews, including the interview concerning his immunity agreement, Kennedy never mentioned injecting cocaine with defendant on December 7, 1982, (2) in his original interview, Kennedy claimed defendant borrowed Kennedy's car between 5:00 and 6:00 p.m. on December 7, 1982, and returned it between 7:00 and 7:30 p.m., and (3) at the preliminary hearing (preceding the 1984 trial), Kennedy described injecting cocaine with defendant as they drove around together on the evening of December 7, 1982.

stove. She did so because defendant would be in a bad mood when he returned, "so I figured if I burned the jacket, tomorrow was payday [i.e., welfare check day], he was going to get a new one and he would be pacified." The police arrested Cornwell as an accessory when she told them about the jacket.

### B. *Defense case.*

Dr. Ernest Klatte, a psychiatrist, interviewed defendant once in December 1982, once in January 1983, and twice more in 1990, for a total of eight and three-quarter hours. Before the first interview, Dr. Klatte reviewed reports of the Harbitz murder investigation prepared by the public defender and the Fullerton Police, as well as the forensic report of the Orange County Sheriff's crime lab. He also reviewed defendant's past medical reports. These included indications that, in the past, defendant had suffered two serious traffic accidents, both of which rendered him temporarily unconscious. According to Dr. Klatte, defendant provided the following version of the events of December 7, 1982:

For some time, defendant had been injecting cocaine daily, and had been drinking considerably. On December 7, he drank a "fair amount" of beer in the morning and a half-pint of whiskey in the afternoon. After consuming the whiskey, he smoked a PCP cigarette. He also shared a quarter-gram of cocaine with Kennedy.

After injecting the cocaine, defendant and Kennedy drove to defendant's parents' house, where defendant hoped to talk his mother out of money for more drugs. However, his father was home, so he could not obtain the money. Next, defendant went looking for William Harbitz, but found he had moved. Defendant then had Kennedy drive him to the home of William's parents, who had been nice to him, to find out how to contact William. Defendant was developing "one of his headaches, which he had on and off for some years." During these episodes, he did not like being around people and felt prone to anger easily. He did not mention the headache to Kennedy. He was also starting to feel effects of the PCP he had consumed.

When they arrived in the Harbitzes' neighborhood, defendant told Kennedy to park around the corner because Kennedy seemed "kind of edgy." When defendant knocked on the Harbitzes' door, Aileen invited him in. The warmth inside the house bothered him. After he chatted briefly with Aileen, she suggested he go to the back bedroom and talk with Francis. He did so.

As defendant was leaving Francis's room, he noticed a billfold out of the corner of his eye, and "things started getting very strange." He felt he was

part of Halloween II (Universal Pictures 1981), a popular horror movie. Events kept changing speeds, and items inside the house became distorted.

In the 1982 to 1983 interviews, defendant said he recalled only that he grabbed Aileen and that Francis came down the hall saying, "what's going on here." According to defendant's 1982 to 1983 account, he had no memory of pulling out his knife or stabbing, and he remembered nothing else until he was outside ready to leave in the car. In 1990, he said he was "tripping" and had actually hallucinated a man coming at him with a knife.

Defendant did remember that he had two wallets when he left the Harbitz house. He also acknowledged that he went through the wallets looking for money, then discarded them in a bushy area and a sewer. Defendant discussed these events in a way that implied he acted "to get rid of the evidence."

Assuming defendant told the truth about the drugs he ingested on December 7, 1982, Dr. Klatte opined that their effects would tend to make him impulsive and explosive, with an impaired ability to interpret events, act thoughtfully, exercise judgment, and weigh consequences. He would likely have been paranoid, delusional, and excitable, and might have hallucinated.

Dr. Klatte acknowledged that defendant had an antisocial personality, might have lied about the events of December 7, and might be malingering. Defendant's antisocial personality, plus his understanding that the mental evaluation was intended to assist him at trial, raised a high clinical suspicion of malingering. Kennedy's and Cornwell's assessments that defendant seemed sober on December 7 also "raised a question in [Dr. Klatte's] mind about what happened inside the [victims'] house," although experienced drug users become more adept at masking their symptoms, and long-term use of drugs like cocaine and PCP can produce momentary psychotic or other explosive effects unrelated to the most recent ingestion. Dr. Klatte did particularly suspect defendant's 1990 hallucination claim, because defendant had not mentioned this experience in his earlier interviews. Dr. Klatte further conceded that, while defendant professed not to remember the stabbings, much of his activity that night was goal oriented, to obtain money for drugs.

Lawrence Plon, a pharmacist, testified to the usual effects of cocaine and PCP. Plon said cocaine is a central nervous system stimulant. When injected, it produces a very excited "high" feeling often compared to sexual orgasm. PCP separates the consciousness from the body. It can produce excitement or catatonic withdrawal, aggression, paranoia, hallucinations, and delusions.

## II. PENALTY EVIDENCE

### A. *Prosecution case.*

The parties stipulated that on October 16, 1980, defendant pled guilty to committing a misdemeanor assault against James Davis on September 15, 1980. The prosecution also presented evidence, essentially uncontested, that defendant participated in the armed robbery of a Payless Shoe Source store in Temple City on October 12, 1982. Defendant personally pulled a handgun on the clerk, Paula Kelly, and forced her to open both the cash register and the store safe.

Finally, the prosecution sought to prove that defendant murdered 75-year-old Houston Compton in Fullerton on August 22, 1980. Compton's blood-soaked body, with the back pants pocket pulled out, was found around 7:30 that same evening near the center of the Fullerton College campus. The victim was last seen alive between 6:00 p.m. and 6:30 p.m. at Coco's, a restaurant less than two miles from the campus and about one mile from the International Hotel, where defendant then lived.

The five-foot two-inch, 115-pound victim suffered a stab wound to the upper chest and some 34 slash wounds to the fingers, hands, forearms, elbows, upper chest, face, and head. The fatal wound extended from the side of the face to the neck, severed the jugular vein, and nicked the carotid artery, causing massive loss of blood. The wounds could have been inflicted by a Frontiersman 124 buck knife.

Compton's early 1960's Ford Fairlane was found abandoned in Santa Monica on September 11, 1980. His wallet was lying on the front seat. There were blood spots, spatters, and smears on the dashboard, the under-dash air conditioning unit, a seat cushion on the front passenger side, and the inside of the front passenger door, as well as pooled blood on the passenger side floorboards, both front and rear. Extensive debris, including a McDonald's restaurant bag with a receipt inside and other discarded food wrappings and containers, was removed from the car. The receipt was for a purchase of two hamburgers at 10:12 p.m. on August 22, 1980, from the McDonald's restaurant on Leffingwell Road in Whittier.

The car's interior also contained gun enthusiast magazines and papers, which were marked with Japanese writing and the handwritten names and addresses, in English, of gun shops. In the trunk, police discovered a box labeled "buck knife," and, under a tire iron, a trench coat with the name "George Murphy" embroidered inside. This coat also had labels identifying a tailor shop in Japan, as well as a tag with handwritten letters that appeared

to be a P and a B. No matchable fingerprints were found in the vehicle or on any items taken from it. DNA test results for the genetic materials collected in the case (i.e., blood, hairs, scrapings from the victim's fingernails) did not point to defendant.

Roger Green testified as follows: In 1980, he owned a gun shop in Whittier. In late August of that year, he sold a Frontiersman 124 buck knife, in its box, to two men. The men also expressed an interest in purchasing a Walther handgun, which Green did not sell. One of these customers resembled a photo of a man named Charles Connell.

The prosecution sought to prove defendant's identity as Compton's killer in several ways. William Harbitz testified as follows: One evening in August 1980, defendant came to the door of Harbitz's apartment. Defendant had been drinking, and said he had been in a knife fight. There was blood on defendant's T-shirt. The next morning, Harbitz found blood on the fender of his dune buggy, which was parked in the direction from which defendant had approached.

Linda Weissinger testified as follows: In August 1980, then 16 years old, she worked at the McDonald's restaurant on Leffingwell Road in Whittier. Around 10:15 p.m. on August 22, 1980, during the closing rush, a man driving a white, early '60s car like Compton's ordered two hamburgers at the drive-through window. Weissinger took the order, while another employee, Shelly Stowell, received the customer's money and handed him the food. They noticed the man because he had blood on his T-shirt—Stowell remarked what a "slob" he was—and because, unlike most customers, he parked away from the drive-through window, and leaned toward the passenger side of the car, as if he did not wish to be seen. Weissinger observed the man for 40 to 50 seconds. From her angle, she saw him only in three-quarters profile, and the car's roof prevented her from observing his upper forehead and hair. Nonetheless, in May 1983, she picked defendant's picture from a six-photo array. At trial in 1992, Weissinger confirmed she was "sure" in May 1983 that the photo she picked at that time showed the man she saw at McDonald's on August 22, 1980.

During direct and cross-examination, Weissinger revealed that, before she identified defendant in May 1983, she had picked other men at November 1980 and July 1981 live lineups. The man Weissinger identified with "99 percent" certainty at the November 1980 live lineup was some 50 pounds heavier than the person she saw on August 22, 1980, and there were also differences in facial hair and hair style and color. The man she identified at the July 1981 live lineup "seem[ed] to have lost some weight and grown some facial hair." Weissinger explained that the police had told her to

discount such differences, because someone's appearance could change in those ways over time. After picking defendant from the May 1983 photo array, she was shown the *same* group of photos on two later occasions—in April 1985 and January 1991. These were the only times she saw the same photos more than once.

## B. *Defense case.*

Responding to Weissinger's testimony for the prosecution, Dr. Kathy Pezdek, a clinical psychologist, testified about factors undermining the accuracy of eyewitness identifications. Dr. Pezdek indicated that stress, a poor opportunity to observe in the first instance, and loss of memory due to passage of time can all contribute to mistaken identification. Accuracy can also be compromised, Dr. Pezdek explained, when the witness is anxious to help the police by identifying someone. In Dr. Pezdek's view, Weissinger's multiple identifications of different persons implied she was suggestible in this way. The sharply different appearances of the other men Weissinger identified cast further doubt on her accuracy. Moreover, Dr. Pezdek observed, one who meets many people, such as a McDonald's worker, might misidentify someone observed on a particular occasion by unconsciously transferring a memory of someone seen in a entirely different context, such as a neighbor.[5]

Dorothy Boyer, defendant's adoptive mother, testified that defendant was four years old when adopted. Dorothy and her husband Del went to the apartment of defendant's natural mother to pick defendant up. Conditions in that home were poor. The natural mother was anxious to get rid of defendant, and he showed no emotion at their parting. The Boyers agreed on the spot to take defendant's younger sister also. When defendant was adopted, he could hardly talk, and he communicated with grunts. He was in poor physical condition, with boils all over his body, the result of an inadequate diet. The natural mother said defendant's speech problems were because he "didn't get enough oxygen or something" at birth.

Dorothy recounted that as a young child, defendant had many friends, and the Boyer living room "belonged to the whole neighborhood." However, speech problems persisted through defendant's childhood, despite the Boyers'

---

[5] With respect to the defense effort to focus suspicion on "Charles Connell" and "George Murphy" as Compton's killers, the parties stipulated, at the conclusion of the defense case, to the following: In 1974, one Charles Connell was convicted of voluntary manslaughter and sentenced to prison. Men named Charles Connell and George Murphy, who had been housed in the same cellblock, were released from the Orange County jail within half an hour of each other on the morning of August 22, 1980. One Charles Connell died in a Veterans Administration hospital in 1989.

attempts to help, and he began wearing glasses in the third or fourth grade. As a consequence, other children made fun of him, and his social and academic development was impaired. He became more withdrawn. He wet his bed until he was 10 or 11 years old. Initially, he worked hard in school and obeyed the rules, but he repeated second grade, and despite home tutoring, his performance worsened through elementary school. The Boyers spent money to support defendant's interests in art and music. Del, whom defendant idolized, engaged in many pursuits with him, including homework, chess, baseball, and soapbox derby. The family attended church regularly, traveled to Yosemite each year, and took ski vacations together in the winter.

Defendant's school attendance and performance deteriorated further during his teenage years. Dorothy's communication with him became difficult, though he remained close to Del and protective of his younger sister. When defendant was 17, money and a small television turned up missing from the Boyer home. The Boyers suspected drugs. As a result, Del told defendant he would have to leave home when he turned 18. Around the same time, defendant had two traffic accidents. The first time, he was thrown from a car onto the pavement. He hit his head and was hospitalized for three or four days. Subsequently, in a motorcycle crash, he seriously fractured his leg and crushed his hip. This time he was in the hospital for three or four months.

After defendant left home, the Boyers moved to a condominium complex on East Oxford Drive in La Mirada. Around August 1980, defendant periodically visited them there.[6] During this period, Dorothy sensed that defendant had a continuing drug problem and was not choosing his friends well.

Dorothy indicated that she and Del tried to visit defendant in prison, but were treated so badly that defendant urged them not to return. Thereafter, they spoke with him by telephone twice a week, and he regularly sent handmade birthday and holiday cards with his own drawings and cartoons. Dorothy said defendant had often expressed remorse for killing the Harbitzes.

Nancy Ann Lucia was the neighbor of the Boyers who helped arrange his adoption. She accompanied the Boyers to pick up defendant and his sister from their natural mother. Nancy confirmed defendant's poor environment

---

[6] Defense counsel had previously elicited from prosecution witness Weissinger, who identified defendant's photo in relation to the Compton murder, that in August 1980, Weissinger lived with her parents in a condominium on East Oxford Drive in La Mirada—apparently located in the same complex where defendant visited his parents around that time. This, in turn, was intended to support the defense theory, alluded to by Dr. Pezdek, the defense eyewitness identification expert, that Weissinger might have seen defendant in the complex, then mistakenly transferred that memory to the man she saw at the McDonald's restaurant on August 22, 1980.

and physical condition at that time, as well as the obvious lack of bonding between child and natural mother. Nancy said defendant was "a very frightened little boy." According to Nancy, the Boyers were loving and attentive adoptive parents, but Del was a perfectionist who put too much pressure on defendant. Defendant and Nancy's son, who was the same age, had a normal playmate relationship. The Lucias moved away permanently when the two boys were in the fourth or fifth grade, and Nancy did not see defendant after that.

Luis Lucia, Nancy's son, confirmed his close childhood friendship with defendant. Luis did not know defendant as an adult guilty of capital crimes, but he insisted that everyone makes mistakes, and that defendant did not deserve to die.

Sally Forbes, a marriage, family, and child counselor, conducted multiple interviews with defendant and his parents. On this basis, she testified at length about defendant's background and its effect on his psychological makeup. Forbes attached particular significance to defendant's lack of emotion upon parting from his natural mother. Forbes stressed the importance of the first four years of childhood as an influence on later behavior. During this period, Forbes said, children develop autonomy and self-esteem, and they learn about trust and mistrust. Instinctively aware of their need for adult care, they will cling to parents despite neglect and mistreatment. Defendant's lack of bonding with his natural parent, Forbes opined, thus indicated severe mental and emotional deprivation during his earliest years. Moreover, childhood events described by defendant and the Boyers—his persistent speech problem, his night fears including visual hallucinations, and his bedwetting—as well as his episodes of "acting out," such as lying and setting fires, also suggested some great fear- or terror-inducing trauma in his background.

Defendant scored 90 on the Wechsler Adult Intelligence Scale, indicating low average intelligence. With effort, Forbes indicated, defendant thus should have been able to do adequate schoolwork. It appeared from defendant's school history that, responding to the Boyers' love and attention, he was initially enthusiastic, but that he later lacked motivation and simply gave up. As a possible explanation, Forbes noted that adopted children are always insecure about why their real parents did not want them. Usually, Forbes observed, this issue gets worked out through family communication and therapy, but here it did not. Forbes acknowledged school reports documenting an increasing degree of antisocial behavior as defendant got older, and she agreed that his adolescent truancy suggested problems with drugs and alcohol.

Considering the extent of defendant's difficulties, Forbes felt her initial interviews did not uncover the "full story" of his possible preadoption trauma. In 1984, after 30 or 40 interviews, defendant revealed that his natural father had sexually abused him. Defendant said the father would come home, send defendant's older sister out to play, take defendant into the bedroom, force him to perform oral sex, give him pink and orange cookies, and make him promise not to tell. Forbes believed this occurred when defendant was between two and four years old. Early childhood sexual abuse, Forbes indicated, produces deep-seated guilt feelings. It could account, she believed, for defendant's night fears, fire-setting, and bed-wetting during childhood, and could permanently impair his ability to trust, thus producing an alienated "loner."

In Forbes's later interviews with defendant, he had softened his cynical attitudes, and had become more compassionate, mature, and insightful—a change also noticeable in his artwork. He was now able, Forbes said, to set short-term goals, postpone gratification, avoid losing his temper, and judge and react appropriately to situations.

Dr. Jonathan Salk, a psychiatrist, had a single interview with defendant at the Orange County jail. Forbes accompanied Dr. Salk to the jail, but she left the interview room when defendant expressed embarrassment about discussing certain matters in her presence. Defendant then confirmed to Dr. Salk his memories of sexual abuse by an adult male, probably his natural father, when he was a very young child. The details generally corresponded to those defendant had given Forbes. Defendant also recalled incidents of physical violence at his father's hands. In Dr. Salk's opinion, defendant's demeanor and manner of describing these events indicated he was telling the truth. Defendant generally depicted his preadoption childhood as chaotic; his mother was an alcoholic, his father was at home only intermittently, and his older sister was his primary caregiver. Dr. Salk believed defendant exhibited many childhood behaviors linked to severe psychological trauma.

Luis Munoz and Edward Wood, Orange County jail guards, testified that defendant was an average, cooperative inmate who gave no trouble while confined there. Defendant volunteered to clean up the cafeteria, a duty that allowed him to be out of his cell. Toni Bovee, a defense investigator, showed examples of the many original drawings and poems defendant had sent her and her daughter. Bovee said defendant had often expressed remorse for the Harbitz homicides.

Clayton Griffith, a prison art instructor, testified that, in their initial encounters, defendant displayed a "biker macho" demeanor, and his artwork was cold, impersonal, and detached. Over time, however, defendant's artwork

softened, and he began to combine poetry with drawing. Defendant was always reserved, but after six months or so, he became less formal, and more friendly and expressive. His hard demeanor came to seem more like a facade. Defendant was generally polite and caring of others insofar as he had contact with them. He appeared to have good relations with peers and supervisors.

Because he was unavailable at the 1992 trial, the testimony of James Verwys from the prior trial was read into the record as follows: Verwys was a Los Angeles police officer. He occupied the hospital bed next to defendant's after defendant's motorcycle accident. Verwys liked defendant the best of his 20 or so hospital roommates. Defendant seemed a genuine, caring person. He was the only roommate to return after his release from the hospital to visit Verwys. They kept in touch and socialized after Verwys was released. Defendant has redeeming qualities and is worth keeping alive.

### III. Pretrial Issues

#### A. *Motion to suppress evidence.*

As noted above, in *Boyer I* we reversed defendant's original conviction on grounds that his confession in police custody was illegally obtained and should have been suppressed, but we ruled that other evidence in the case was not similarly subject to exclusion as the product, or "tainted fruit," of the illegal police conduct. (*Boyer I, supra,* 48 Cal.3d 247, 276.) Prior to the retrial, defendant moved anew to suppress evidence other than his confession, including the evidence discussed in *Boyer I,* on multiple grounds. His motion was denied, and the challenged evidence was again admitted against him on the issue of guilt.

Defendant urges on appeal that the trial court committed multiple errors in denying his new suppression motion. We find no prejudicial error. Our analysis requires, at the outset, an extensive factual recitation.

#### 1. *Factual and procedural background.*

Before the 1984 trials, defendant moved to exclude his incriminating statements to police, as well as other evidence, on grounds they were obtained in violation of his rights under the Fourth Amendment and *Miranda v. Arizona, supra,* 384 U.S. 436. On the motion, the following facts were adduced:

On the evening of December 14, 1982, without an arrest or search warrant, or probable cause for either, detectives from the Fullerton and El Monte Police Departments surrounded the El Monte house defendant shared with

Cynthia Cornwell and her children. When defendant emerged from the back door, he was detained, and he agreed to accompany detectives to the Fullerton police station for an interview about the Harbitz murders.

Once at the station, defendant received *Miranda* warnings and then underwent a two-hour tape-recorded interrogation by Detective Lewis. Lewis indicated he thought defendant was guilty, did not credit defendant's contrary protestations, and believed defendant could not live with the guilt. Defendant's efforts to invoke his *Miranda* rights to silence and counsel, and to ascertain whether he was under arrest, were repeatedly ignored or evaded. However, questioning finally ceased, and the recorder was turned off.

Lewis then asked defendant if the police could search the El Monte house. Defendant said it was all right with him, but they would have to obtain Cornwell's consent, because "[i]t's her house." Officers Davinroy and Ritter, waiting in El Monte, were dispatched to obtain Cornwell's permission.

Meanwhile in Fullerton, defendant consented to fingerprinting and was taken to the jail facility for that purpose. When he returned from fingerprinting, he spoke with Cornwell by telephone. Though defendant had not yet made any incriminating statements and, according to Lewis, was not under arrest, Lewis overheard defendant tell Cornwell he was being charged with two counts of murder. Defendant advised Cornwell that the decision whether to allow a residential search was hers, because it was her house. After speaking with defendant, and with her own attorney, Cornwell gave oral consent, and the search began.[7]

At the Fullerton police station, Lewis asked defendant to step back into the interrogation room "for a few minutes." The tape recorder was not turned on. Lewis indicated he could not solicit further statements from defendant, because defendant had asked for an attorney. However, Lewis said, he wanted to "tell [defendant] a couple things." Lewis then related to defendant that certain portions of defendant's story did not ring true, in that Paul Harbitz, one of the victims' sons, indicated defendant had done yard work for the senior Harbitzes more recently than defendant maintained. Hence, Lewis admonished, he would be "checking further into the case with Bill Harbitz."

As Lewis then turned to leave the room, defendant called him back and said "I did it." Lewis reactivated the tape recorder and took a new waiver of

---

[7] Neither Cornwell nor the attorney with whom she spoke testified in the suppression hearing that preceded the 1984 trials. Evidence of the circumstances of her consent to the search of the El Monte house came from Detective Lewis, who overheard defendant's end of the telephone conversation with Cornwell, and from Detectives Davinroy and Ritter, who were at the El Monte house to obtain Cornwell's consent.

defendant's *Miranda* rights. Defendant thereupon gave a more complete statement. (*Boyer I, supra*, 48 Cal.3d 247, 263–267.)

Among other things, defendant disclosed that during the fatal encounter, he had stabbed himself in the knee. He revealed that the knife he used to stab the Harbitzes was in his bedroom in El Monte, most likely in a dresser drawer. He said that he had worn Levi's and a blue jacket the night of the murders, and that the jacket had gotten blood on it. He indicated the jacket was on the bedroom floor and the Levi's were in the bedroom closet. Defendant represented that he had gone alone to the victims' home in a car belonging to the mother of his friend John Kennedy.[8] At some point, defendant also directed police to the location of Aileen Harbitz's wallet, which he had discarded near a freeway offramp.

As soon as defendant confessed, information about the Levi's, the jacket, and the knife was transmitted to the officers searching the El Monte house. They recovered bloody Levi's from the bedroom closet and a knife from a dresser drawer, but they found no blue denim jacket. When they asked Cornwell about the jacket, she told them she had burned it in a hibachi on the kitchen stove. The officers advised her she might thereby be implicated in a murder. They placed her under arrest as an accessory and advised her of her *Miranda* rights. She agreed to cooperate.

Detectives also located and questioned Kennedy, who ultimately admitted he drove defendant from the El Monte house to the Harbitz residence on the night of the murders. Kennedy also confirmed the exact location where defendant had discarded the wallet beside the freeway offramp.

Defendant's motion to suppress was denied, and his statement to the police was introduced in the prosecution's case-in-chief. Both Kennedy and Cornwell testified for the prosecution under grants of immunity. The knife, the bloody Levi's, and the recovered wallet were also admitted in evidence.

On appeal from the 1984 judgment, we agreed with defendant that his incriminating statements to the police on December 14, 1982, were the product of violations of his rights under the Fourth Amendment and *Miranda v. Arizona, supra*, 384 U.S. 436. Thus, we ruled, these statements should not have been admitted in the prosecution's case-in-chief to prove

---

[8] At various points in this opinion, we recite, and rely upon, facts that are gleaned from the record of the 1984 trials, but do not appear on the face of our opinion in *Boyer I*. By prior order in this appeal, we granted defendant's requests that we take judicial notice of the entire record of the proceedings leading to the appeal in *Boyer I*. (Evid. Code, §§ 452, subd. (d), 459; cf. *People v. Snow* (2003) 30 Cal.4th 43, 109–110, fn. 26 [132 Cal.Rptr.2d 271, 65 P.3d 749] (*Snow*).)

defendant's guilt, and the error was prejudicial. On this basis, we reversed defendant's conviction. (*Boyer I, supra*, 48 Cal.3d 247, 267–275.)

Defendant pressed the further contention that the knife and bloody Levi's, Kennedy's testimony, and the wallet recovered near the freeway offramp were " 'tainted fruit' of the illegal police conduct," and thus also inadmissible. (*Boyer I, supra*, 48 Cal.3d 247, 256.) He urged that the evidence recovered from the El Monte house was based on his invalid consent to search given while he was illegally detained. He further asserted that the authorities had improperly obtained Kennedy's testimony, and had recovered the wallet, as the result of information invalidly obtained from defendant. (*Id.* at p. 276.)

We rejected these arguments. Based on the record then before us, we reasoned as follows: The search of the El Monte house was based not on defendant's invalid consent, but on the voluntary, untainted consent of Cornwell. During the consensual search, and after the authorities located the knife and bloody Levi's the search would inevitably have produced, Cornwell volunteered she had burned the blue jacket, an inherently suspicious event leading to the arrest that persuaded her to cooperate with the authorities. Cornwell's cooperation would have led the police to Kennedy, for she knew defendant was in Kennedy's company on the night of the murders. Armed with information from Cornwell about Kennedy's involvement, police would certainly have obtained his cooperation. Thus, both his testimony and his independent knowledge of the discarded wallet's location would have been procured regardless of defendant's statement. (*Boyer I, supra*, 48 Cal.3d 247, 276–279.)

On retrial, defendant filed a new motion seeking to suppress the knife, the Levi's, the wallet, and the anticipated testimony of both Cornwell and Kennedy as "tainted fruit" of his illegal detention and confession. Defendant also claimed that Cornwell's consent to search the El Monte house, and her anticipated testimony on retrial, were the result of coercive tactics by the authorities against her. Defendant sought an evidentiary hearing on these issues.

The trial court determined that our decision in *Boyer I* was the law of the case as to all issues addressed therein, and that relitigation of those issues was thus foreclosed. Accordingly, the court ruled, defendant could not raise claims (1) that the search of the El Monte house was the "tainted fruit" of defendant's illegal detention, confession, and consent, (2) that Cornwell's consent to the search was involuntary, or (3) that procurement of Kennedy's information and testimony was not inevitable.

However, the trial court permitted defendant to litigate his claim, not raised or addressed in *Boyer I*, that *Cornwell's testimony* should be excluded as the

result of official coercion against her, and as the tainted product of defendant's illegal arrest, detention, and confession. The parties stipulated "as far as the purposes of this hearing," that the facts recited by our opinion in *Boyer I* were true.

At the evidentiary hearing, Detective Lewis testified for the prosecution as follows: When he and other officers approached the El Monte house on the evening of December 14, 1982, he knew defendant lived there with a woman and her three children. Had defendant not been home, and had the woman been cooperative, Lewis would have inquired about defendant's whereabouts, and would also have asked her where defendant was on the night of December 7. If she were not cooperative, Lewis would have left.[9]

When the officers knocked, Cornwell came to a window and indicated that defendant was there but could not come to the front door because it was jammed.[10] After defendant emerged from the back door and was detained, the officers and defendant went back inside, where Lewis explained to Cornwell, who was very emotional, that defendant had agreed to accompany them to the Fullerton station for an interview. Lewis indicated defendant would be gone about three hours. Cornwell asked if defendant was under arrest; Lewis said he was not. Cornwell also asked if she could follow them to the police station. Lewis agreed, but Cornwell was unable to arrange transportation or child care. Lewis did not recall telling Cornwell that the matter involved a murder investigation.

While in Lewis's presence at the station, defendant had two phone conversations with Cornwell, one "after the initial interview," and the second after defendant returned from fingerprinting. In the first call, Lewis heard defendant tell Cornwell it was her decision whether to allow a search.[11] Lewis did not know the substance of the second call, but he did hear defendant tell Cornwell he was "arrested for a couple murders."[12] To the best of Lewis's recollection, both of these calls occurred before defendant confessed.

---

[9] On cross-examination, Lewis indicated that he might have told Cornwell what the investigation was about and asked if she was willing to talk, but if she had strongly expressed an unwillingness to cooperate, he said, "at that point in the investigation, I wouldn't have been that strong on whether or not I talked to her."

[10] Lewis considered Cornwell to be cooperative at this point, but in hindsight, he conceded, she might just have been trying to buy time for defendant to escape out the back.

[11] Lewis confirmed that, at some point, there was a decision by police to seek a permissive search.

[12] Lewis conceded that Detective Ritter, who was then at the El Monte house, placed the calls on Cornwell's behalf, and that Cornwell would not have been allowed to speak immediately to defendant if Ritter had not placed the calls.

Other evidence established that Cornwell was arrested and jailed overnight after officers searching the El Monte house pursuant to her prior oral consent learned of defendant's confession and the significance of the blue jacket, asked her about the jacket, and were told she had burned it. (See discussion, *ante* and *post*.) In response to defense counsel's question on cross-examination, Lewis agreed that, before defendant confessed, it would not have been appropriate to arrest someone as an accomplice for destroying evidence such as a bloody jacket, because until then, "I didn't know he had committed the murder."

On December 21, 1982, Lewis returned to the El Monte house to interview Cornwell further. Cornwell was "edgy" but calmer than on December 14. She said she was under a doctor's care and did not want to speak to the police. Lewis told her defendant had confessed, "so she might as well talk to us." In taking this approach, Lewis, aware of Cornwell's emotional attachment to defendant, was seeking to persuade her that she "wouldn't be telling us anything we didn't already know." Cornwell declined to talk on that occasion but said she might do so later after speaking to her psychologist and her attorney.

Cynthia Cornwell testified for the defense as follows: On December 14, 1982, some three or four hours after defendant was taken to the police station, "at least" two other detectives came to the house. She did not recall whether they asked to search, or whether she consented to the search before or after she learned defendant had been arrested. She did speak by telephone both to defendant and to her attorney about allowing a search. She remembered little about the substance of those conversations, or how the calls were placed. During the search, she knew defendant was suspected of murder. She also was aware the police had not kept their promise to have defendant home in two or three hours.

According to Cornwell, both before and during the search, the officers mentioned that her children could be taken away because the house was dirty and messy. She could not recall whether this was first said before or after she consented to the search, but it was after she spoke to defendant and her attorney. She took the reference to her children as a threat unless she cooperated against defendant. During this time, Cornwell was "upset," "scared," and "very, very emotional."

Something that "terrified" Cornwell during the search was that one of the officers tossed or dropped her infant daughter off a bed, from a height of 12 to 18 inches, so he could look underneath it. One other detective and Cornwell's five-year-old daughter were also in the room at this time. The baby was not hurt, but Cornwell felt the officer did this to "intimidate me."

Also, Cornwell wanted to give her children baths to keep them calm, but detectives would not let her do so unless an officer "stood right there and watched the whole thing."

During the search, the officers asked Cornwell where certain items of clothing could be found, "and I was telling them." When they asked about the jacket, she told them she burned it on the stove. She showed the officers the scraps that were left. They said she could or would be charged as an accessory. They arrested her, had her sign a search consent form, and took her to jail. At the time she was arrested, she knew defendant had confessed. She felt that some pressure was being applied against her at the time of her arrest. The police sought to interview her while she was in jail, but she realized they had lied to her, and were still lying to her, so she refused.

Cornwell was released the next day; she assumed it was because she was sick. She did not know whether she would be charged, and she did not want to know. She did not call a lawyer after she was released. Shortly after her release, she was hospitalized with hepatitis and jaundice. She also was placed on medication for mental problems, including anxiety, "so I [could] walk out of my house without panicking if I saw a man in a business suit." The medication helped, and she was no longer taking it.

Cornwell thought any information she had would help defendant, because she "honestly did not believe he did it," but at first she was not willing to testify. Defendant's confession had nothing to do with her ultimate decision to cooperate. She decided to do so when told she would have immunity, out of fear she would otherwise be prosecuted. Moreover, though she later realized they could not take her children, the police threats to do so, and the incident with her baby daughter, caused her to believe that her own life was threatened, and that the police might find a way to retaliate.

At one point, the court asked Cornwell, "[a]s I understand, your *consent to search the house* was based on the activities of the officers making the threats and the way they threatened your child . . . also, is that correct?" (Italics added.) Cornwell replied, "Correct."

Ruth Ohanessian testified for the defense as follows: Cornwell had previously consulted Ohanessian, then a lawyer, about a custody matter.[13] Late one December night, Cornwell called to seek advice about whether she should allow the police to search her house. Cornwell, who was "very upset," and "almost hysterical," indicated "they were threatening to take the children." Ohanessian told Cornwell to stay calm and not to antagonize the officers until Ohanessian called back.

---

[13] At the time of her testimony, Ohanessian was serving a six-year sentence upon a conviction for grand theft.

Ohanessian then tried two or three times to call Cornwell directly. Each time, a "brusque" male voice answered, saying Ohanessian had a wrong number, disclaiming that Cornwell was there, and then terminating the conversation. Finally, with operator assistance, Ohanessian reached someone who identified himself as a police officer. Ohanessian asked why they were saying they were going to take the children. The other party was not willing to give much information. He did not seem surprised at the question, did not deny discussing the children with Cornwell, and gave no legitimate reason why they could be taken. However, he acted somewhat conciliatory and said "they really didn't have any intentions of taking the children. He indicated they were there about something that had nothing to do with [Cornwell], something having to do with her boyfriend."

Ohanessian then spoke to Cornwell. Ohanessian advised that Cornwell "didn't have to be terribly worried about their taking the children" and should "give as little permission as she could" to avoid having the children taken. They were able to talk only briefly, and Ohanessian told Cornwell she would call back later. As the conversation ended, Cornwell was "still upset," but, having been reassured about the children, she was "a tiny bit calmer."

After again trying several times without success, Ohanessian called back much later, shortly after midnight, and spoke to Cornwell. Cornwell said she was being arrested and asked Ohanessian to contact a family member for assistance with the children and possibly to arrange bail.

Detective Rick Ritter testified for the People in rebuttal as follows: He arrived at the El Monte house around 5:50 p.m. on December 14, 1982, and left sometime after 1:00 a.m. He obtained Cornwell's consent to search some four or five hours after he first arrived.[14] His partner, Detective Davinroy, had been told over the telephone at a nearby fire station that defendant had given permission to search, "and we were to contact [Cornwell] at the residence and explain to her what the situation was and request to be allowed to search."

Cornwell was nervous when her consent was requested, and she might have cried at some point. Initially, she expressed particular distrust of Davinroy and said that if Davinroy was going to participate in the search, she wanted to be present, and she wanted receipts. Ritter agreed.

---

[14] Read out of context, Ritter's testimony might suggest he was in Cornwell's home *at all times* between 5:50 p.m. and 1:00 a.m., but all other evidence, including Cornwell's own testimony, is that officers left the house when defendant was taken to the police station. Though perhaps stationed nearby, they apparently did not return until several hours later when, after defendant indicated that a search was up to Cornwell, they received word from the Fullerton police station that they should attempt to obtain Cornwell's consent to search.

Ultimately, six or seven officers were present in the house. Davinroy and Ritter had called for additional officers so that, if consent was refused, the premises could be secured while a warrant was obtained. While the officers were in the house, and prior to Cornwell's arrest, detectives were monitoring Cornwell's calls. Davinroy was answering the telephone because the officers were expecting and receiving calls from the police station. However, when Cornwell said she wanted to call her attorney before authorizing a search, Ritter said "go ahead." When Ohanessian called back, she was allowed to speak to Cornwell once she identified herself.

Ritter insisted he made no threats, about the children or otherwise, to Cornwell at any time, nor did he hear anyone else do so. According to Ritter, when Cornwell first realized she was going to be arrested, she was concerned about what would happen to the children, but when Ritter assured her they would be taken care of, she calmed down.

At some time during the evening, Ritter saw two detectives, Cornwell, Cornwell's daughter, and an infant together in the bedroom, but he never observed anyone touch the baby, pick up the baby, or toss the baby on the floor. He was not always in the same room with every child or every officer. However, he stayed with Cornwell at all times and never let her out of his sight, because "she was a witness in a homicide and/or a suspect."

At the time the detectives obtained Cornwell's consent, they did not know defendant had confessed. However, they did know of defendant's confession by the time Cornwell was arrested.

On this record, the trial court ruled that Cornwell's testimony was neither coerced nor tainted. The court found nothing coercive in the initial contact with the police, particularly since Cornwell was told that she could accompany defendant to the station and that the interview would last only two or three hours. Similarly, the court saw nothing objectionable in "the officer . . . answering the phone and things of that nature." As to the claim of a threat to take Cornwell's children, the court found that no such threat occurred. The court surmised that Cornwell, in an emotional state and already concerned about child custody issues, might have misinterpreted innocent remarks. While the court declined to determine whether Cornwell's baby was tossed from the bed, the court's comments suggested doubt that such an incident occurred.[15] In the court's words, "I don't see there's anything here that the officers did that was certainly threatening to the children."

---

[15] After noting that the evidence was in conflict on this issue, the court said, "I don't know if it happened or it didn't happen. [It] [w]ould seem to me that the officers would pick up on the fact that they are dealing with someone who is difficult because of her emotional situation, so we have that situation to start with."

The court next noted our conclusions in *Boyer I*—accepted for purposes of this hearing—that, though initially hostile when asked for consent to search, Cornwell became cooperative after consulting with defendant, "which she did," and with her attorney, "which she surely did," and that during the ensuing lawful search, the police found the knife and bloody Levi's and asked about the jacket. The court also noted our *Boyer I* determination that, even if defendant had not mentioned the jacket and its significance, the officers would have discovered the burned jacket, scraps of which were still flying around the kitchen, would have questioned Cornwell about this "unusual and suspicious event," and would have received the explanation Cornwell readily volunteered.

In sum, the court concluded "that [Cornwell] cooperated of her own free will and volition," and that her later statements were not tainted by defendant's illegal arrest because her testimony would inevitably have been procured by lawful means. Accordingly, the court denied defendant's motion to suppress.

On appeal defendant renews his contention that the testimony of Cornwell and Kennedy, the bloody Levi's, the knife, and the wallet should have been suppressed because (1) they were obtained by exploiting defendant's illegal detention and the invalid confession thereby obtained, and (2) they would not inevitably have been procured by other lawful means. He urges further that Cornwell's consent to the search of the El Monte house, and her agreement to testify at trial, were the involuntary products of official coercion toward her.[16]

### 2. *Law of the case.*

Defendant first asserts, as he did below, that the trial court should not have invoked the law-of-the-case doctrine to limit the suppression theories he could litigate on retrial. He argues the doctrine is inapplicable at the threshold

---

[16] In *Boyer I*, we concluded that defendant had suffered violations of his rights under both the Fourth Amendment and *Miranda v. Arizona, supra*, 384 U.S. 436. However, the new suppression motion on retrial was brought under Penal Code section 1538.5 (governing suppression of evidence obtained as a result of illegal searches and seizures), and to the extent the new motion argued that evidence should be excluded as the "tainted fruit" of the illegal police conduct found in *Boyer I*, it did not allude to *Miranda*. Similarly on appeal, defendant has not cited *Miranda* as a basis for his "tainted fruit" arguments. With respect to these claims, we therefore address only the exclusionary rules applicable to search and seizure violations under state and federal law. In that regard, we note that the Harbitz murders were committed in December 1982, after the effective date (June 1982) of Proposition 8's Truth-in-Evidence provisions (Cal. Const., art. I, § 28, subd. (d)). Proposition 8 therefore applies to this case. (*People v. Smith* (1983) 34 Cal.3d 251, 257–263 [193 Cal.Rptr. 692, 667 P.2d 149].) Accordingly, relevant evidence obtained in violation of defendant's rights, state or federal, against unreasonable searches and seizures may be excluded only as required under the Fourth Amendment. (*In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].)

because *Boyer I*'s discussion of evidence other than defendant's illegal confession was mere dictum. He further contends that, because "inevitable discovery" and the validity of Cornwell's consent to search were not litigated in the original trial, the record we analyzed in *Boyer I* was not fully developed. By invoking the law of the case in order to allow the introduction of incriminating evidence on untested theories of consent and inevitable discovery, defendant insists, the instant trial court thus lightened the prosecution's burden of proof in violation of the due process clause of the Fourteenth Amendment. As a consequence, defendant urges, he suffered infringement of his Sixth Amendment rights to a jury trial and to present a defense, and of his Eighth Amendment right to present all evidence material to his defense against a judgment of death.[17]

■ "[W]here an appellate court states a rule of law necessary to its decision, such rule ' "must be adhered to" ' in any ' "subsequent appeal" ' in the same case, even where the former decision appears to be ' "erroneous" ' " (*People v. Whitt* (1990) 51 Cal.3d 620, 638 [274 Cal.Rptr. 252, 798 P.2d 849] (*Whitt*), quoting *People v. Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211].) Thus, the law-of-the-case doctrine "prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances." (*Whitt, supra,* at p. 638.) The doctrine is one of procedure, not jurisdiction, and it will not be applied "where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice' [citation] . . . ." (*People v. Stanley* (1995) 10 Cal.4th 764, 787 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*).)

Defendant first suggests the law-of-the-case doctrine is inapplicable here because *Boyer I*'s discussion of evidence other than the illegal confession that

---

[17] With respect to this and virtually every other claim raised on appeal, defendant urges that the error or misconduct he is asserting infringed various of his constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none.

led to our reversal was not "necessary to [our] decision" (*Whitt, supra,* 51 Cal.3d 620, 638), but was mere dictum (see *Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 474 [304 P.2d 7]). We disagree. In *Boyer I, supra,* 48 Cal.3d 247, 256, defendant pressed his "tainted fruit" arguments for the clear purpose of establishing that *not only* his confession, but also *most of the other evidence* introduced against him, was subject to exclusion. Had we accepted defendant's claims, the result might well have been to *preclude a retrial* for lack of legally sufficient admissible evidence. *Boyer I's* determination that the challenged evidence appeared free of taint thus ensured that the case could properly be set at large.

■ Moreover, "[a] decision on a matter properly presented on a prior appeal becomes the law of the case even though it may not have been absolutely necessary to the determination of the question whether the judgment appealed from should be reversed. [Citations]." (*Steelduct Co. v. Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 643 [160 P.2d 804].) Thus, application of the law-of-the-case doctrine is appropriate where an issue presented and decided in the prior appeal, even if not essential to the appellate disposition, "was proper as a guide to the court below on a new trial." (*Westerfeld v. New York Life Ins. Co.* (1910) 157 Cal. 339, 345 [107 P. 699].)

On the other hand, the law-of-the-case doctrine governs only the *principles of law* laid down by an appellate court, as applicable to a retrial of fact, and it controls the outcome on retrial only to the extent the evidence is substantially the same. (E.g., *People v. Barragan* (2004) 32 Cal.4th 236, 246 [9 Cal.Rptr.3d 76, 83 P.3d 480].) The doctrine does not limit the new evidence a party may introduce on retrial. (*Id.* at p. 247.) Thus, it does not preclude the presentation of *new evidence* on suppression issues when an appellate court reverses a conviction and sets the cause at large for a new trial.

We so concluded, on the People's behalf, in *People v. Mattson* (1990) 50 Cal.3d 826 [268 Cal.Rptr. 802, 789 P.2d 983] (*Mattson II*). Previously, in *People v. Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887] (*Mattson I*), we had reversed the defendant's convictions of capital and noncapital crimes because the trial record indicated that, in violation of California law, he had confessed to two murders and various sexual offenses in response to custodial interrogations initiated by police officers after he invoked his rights to silence and counsel. On retrial, the People were allowed to relitigate the admissibility of the confessions. The People presented evidence, not previously adduced, that the defendant had initiated the conversations leading to his confessions, and the trial court admitted the confessions. On appeal, the defendant urged that relitigation of this issue was inappropriate because, among other reasons, *Mattson I's* determination that the confessions were inadmissible was the law of the case.

■ We rejected this contention, explaining that "[t]he law-of-the-case doctrine binds the trial court as to the law but controls the outcome only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based. [Citations.] The law-of-the-case doctrine applied to this court's prior ruling only insofar as we held that California law governed the admissibility of the confessions. The trial court did not depart from that ruling in its determination, based on new evidence, that the confessions were admissible." (*Mattson II, supra,* 50 Cal.3d 826, 850.)[18]

The same principle governs here. Our discussion of suppression issues in *Boyer I* was based on the record then before us. Even if the law-of-the-case doctrine makes *Boyer I* conclusive on the legal principles there established, the doctrine did not foreclose new evidence on retrial indicating that the dispositive facts are materially different than those we addressed.[19]

The trial court therefore erred in ruling that the law-of-the-case doctrine precluded defendant from relitigating, on the basis of new evidence, the issues we addressed in *Boyer I.* The question remains whether we can nonetheless uphold the trial court's denial of defendant's motion to suppress,

---

[18] *Mattson II* also found no other basis for precluding relitigation of the confessions' admissibility after a reversal on appeal. As we explained, "A reversal of a judgment without directions is an order for a new trial. (§ 1262.) 'An unqualified reversal remands the cause for new trial and places the parties in the trial court in the same position as if the cause had never been tried.' [Citation.] 'The granting of a new trial places the parties in the same position as if no trial had been had. . . .' (§ 1180.) [¶] That status even permits amendment of the accusatory pleading [citation], as well as renewal and reconsideration of pretrial motions and objections to the admission of evidence. [Citation.]" (*Mattson II, supra,* 50 Cal.3d 826, 849.)

As noted above (fn. 15, *ante*), defendant's renewed suppression motion, which included claims previously addressed in *Boyer I,* was brought under section 1538.5, governing the suppression of evidence obtained as the result of illegal searches and seizures. Section 1538.5 imposes certain limits on the relitigation of suppression issues. However, no case has decided the extent to which section 1538.5 precludes such relitigation after an appellate reversal. (See, e.g., *Mattson II, supra,* 50 Cal.3d 826, 850, & fn. 10; but cf. *People v. Brooks* (1980) 26 Cal.3d 471, 475–483 [162 Cal.Rptr. 177, 605 P.2d 1306]; *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640–641 [108 Cal.Rptr. 585, 511 P.2d 33].) Moreover, aside from a brief response at oral argument to a question from the bench, the People have never argued, either in the trial court or on appeal, that the new suppression motion in this case was barred by section 1538.5. We therefore do not address the issue.

[19] *Stanley, supra,* 10 Cal.4th 764, is not to the contrary. There, after the trial court granted in part, and denied in part, a motion to suppress evidence in a capital case, both the defense and the prosecution petitioned for writs of mandate. In an unpublished decision, the Court of Appeal granted in part, and denied in part, each petition. We denied the defendant's petition for review. On automatic appeal from the subsequent death judgment, the defendant sought our reconsideration of the *exact* suppression issues previously, and finally, decided by the Court of Appeal. We concluded that, absent manifest injustice or an intervening change in applicable law, the law-of-the-case doctrine precluded such reconsideration. (*Stanley, supra,* at pp. 786–790.)

in whole or in part. For the reasons that follow, we conclude that we may affirm the trial court's ruling in its entirety.

### 3. *Claim that Cornwell's testimony was coerced.*

We first address defendant's claim that Cornwell's *testimony* was procured by coercive police tactics. This assertion, not raised in the original trials or addressed in *Boyer I*, was fully litigated on retrial. On the record thus developed, we find no basis to disagree with the trial court's determination that Cornwell's testimony was not suppressible on this ground.

The principles applicable to a coerced-testimony claim are settled. The defendant has no standing to assert a violation of another's constitutional rights. The coerced testimony of a witness other than the accused is excluded in order to protect the defendant's own federal *due process* right to a fair trial, and in particular, to ensure the *reliability* of testimony offered against him. A claim that a witness's testimony is coerced thus cannot prevail simply on grounds that the testimony is the "fruit" of some constitutional transgression against the witness. Instead, the defendant must demonstrate how such misconduct, if any, has directly impaired the free and voluntary nature of the anticipated testimony in the trial itself. (*People v. Badgett* (1995) 10 Cal.4th 330, 342–350 [41 Cal.Rptr.2d 635, 895 P.2d 877] (*Badgett*); *People v. Douglas* (1990) 50 Cal.3d 468, 501–502 [268 Cal.Rptr. 126, 788 P.2d 640].)

On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair. (*Badgett, supra,* 10 Cal.4th 330, 350–351.) In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence.

Applying these standards, we accept the trial court's finding that the authorities engaged in no improper coercive conduct toward Cornwell that caused her testimony at the 1992 retrial to be involuntary. Cornwell implied that she was intimidated by events that occurred on the night of December 14, 1982, when the police searched the El Monte house. These incidents, according to Cornwell, included police threats to take away her children, and her observation of an officer tossing her infant daughter off a bed.

However, the trial court credited the testimony of Detective Ritter that no threats about the children's custody were made. Detective Ritter further testified that he had Cornwell in his sight at all times on the night of December 14, and he neither committed nor saw any physical mishandling of a child. On this basis, the court properly expressed doubt about the "baby tossing" episode as well.

■ Moreover, Cornwell herself made clear that her primary reason for her cooperation at trial was the prosecution's offer of immunity from prosecution as an accessory, based on her burning of the jacket defendant wore on the night of the murders, in return for her truthful testimony. There is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in return for the witness's promise to testify fully and fairly. (*Badgett, supra*, 10 Cal.4th 330, 354–355; *People v. Daniels* (1991) 52 Cal.3d 815, 862 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Allen* (1986) 42 Cal.3d 1222, 1252 [232 Cal.Rptr. 849, 729 P.2d 115] (*Allen*).) As we conclude elsewhere in this opinion, Cornwell's immunity agreement was not coercive, because it did not require her to testify to a particular version of events, or in conformity with any prior statement, but was conditioned entirely on her telling the truth. (See discussion, *post*, at p. 457.)

Cornwell testified in both trials, and there was more than a nine-year lapse between the 1982 murders and Cornwell's testimony in defendant's 1992 retrial. This ample period for reflection, during which Cornwell conceded she realized the police could not take her children, further ameliorates any effect of her confrontation with the police on December 14, 1982, as a factor undermining the voluntary nature of her subsequent testimony. (See, e.g., *Badgett, supra*, 10 Cal.4th 330, 353.) Under these circumstances, the record amply persuades us that Cornwell's testimony was not improperly coerced.

### 4. *Claim of involuntary consent to search.*

■ Defendant next urges that Cornwell's consent to search the El Monte house she shared with defendant was involuntary and thus invalid because she was coerced by police threats and intimidation. A warrantless search may, of course, be based on the consent of a person, other than the accused, who has joint dominion or control over the area or thing to be searched. However, the defendant may challenge the validity of the consent insofar as the search infringed his own expectations of privacy under the Fourth Amendment. (*Minnesota v. Carter* (1998) 525 U.S. 83, 88 [142 L.Ed.2d 373, 119 S.Ct. 469]; *United States v. Matlock* (1974) 415 U.S. 164, 170–171 [39 L.Ed.2d 242, 94 S.Ct. 988]; *People v. Jenkins* (2000) 22 Cal.4th 900, 971–972 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).) A consent to search is invalid if not freely and voluntarily given. (*Florida v. Royer* (1983) 460 U.S. 491, 497 [75 L.Ed.2d 229, 103 S.Ct. 1319] (*Royer*).)

The voluntariness of consent is a question of fact to be determined from the totality of circumstances. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 93 S.Ct. 2041] (*Schneckloth*); *Jenkins, supra*, 22 Cal.4th 900, 973.) If the validity of a consent is challenged, the prosecution must

prove it was freely and voluntarily given—i.e., "that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority." (*Schneckloth, supra,* at p. 233; see *Royer, supra,* 460 U.S. 491, 497.)

In *Boyer I,* we found, on the record then before us, "no evidence or contention that Cornwell was improperly coerced to give her consent." (*Boyer I, supra,* 48 Cal.3d 247, 276.) Specifically, we noted, Cornwell, "[t]hough initially hostile, . . . became cooperative" (*id.* at p. 278) after consulting with defendant, who left the matter entirely up to her, and with an attorney (*id.* at pp. 277–278).

Though defendant insists otherwise, it appears any new facts bearing on this issue were fully disclosed during the suppression hearing conducted on retrial. There, in the context of litigating whether Cornwell's *testimony* was coerced (see text discussion, *ante,* pp. 444–445)—and with the burden of proof on the People—the circumstances surrounding Cornwell's consent to search were thoroughly explored. Detective Lewis testified, as in the prior trial, about the circumstances of defendant's preconsent telephone conversation with Cornwell. Cornwell and Detective Ritter, both present at the El Monte house, described at length the events there that led to Cornwell's consent to search. Ruth Ohanessian, the lawyer with whom Cornwell consulted, also testified about the circumstances and substance of their conversations. In response to a specific question by the trial court, Cornwell conceded she was describing the events crucial to her agreement to allow the El Monte house to be searched.

Under these circumstances, we are convinced we may confirm, on the totality of circumstances, our prior conclusion that Cornwell's consent to search was voluntary. The request for consent took place in an environment most familiar and comforting to her—her own home. Cornwell was, of course, upset and emotional when the police took defendant to the Fullerton station, and again when officers returned to seek permission to search. Such events are inherently stressful. However, several hours intervened between the officers' original departure and their return. No effort was made to secure the premises during this interlude. Cornwell was alone with her children, giving her time for reflection and calm. Indeed, she took the opportunity to burn the jacket defendant wore on the night of the murder.

Once the detectives did return, there is no indication, other than as discussed below, that they behaved discourteously. Though eventually there were six or seven officers on the premises, Cornwell gave no indication her will was overborne by the sheer number of personnel in the house. (Cf., e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103]

(*Weaver*).) Similarly, Cornwell did not suggest she was affected by the monitoring of her telephone, or by her understanding that defendant was suspected of murder.

Significantly, Cornwell acknowledged she was allowed to consult with both defendant and an attorney before giving her permission. Despite her stress, she had the presence of mind to insist on doing both. Though she signed a written consent form only after her arrest, she gave oral permission well before that time.[20]

Cornwell did testify at the suppression hearing on retrial that she was threatened with the loss of her children, and that an officer roughly handled her infant daughter, with the purpose, Cornwell believed, of "intimidat[ing]" her. However, based on the contrary testimony of Detective Ritter, and its observation of both witnesses, the trial court declined to credit Cornwell on these points. We have no basis to disagree. (See *Jenkins*, *supra*, 22 Cal.4th 900, 973.) In our view, the record, now fully developed, amply demonstrates that Cornwell gave voluntary consent to the search of the El Monte house.[21]

### 5. *"Tainted fruit" claim.*

Finally, defendant urges that the testimony of Cornwell and John Kennedy, and the admission into evidence of the knife, Levi's, and wallet, are "tainted fruit" of the illegal police conduct toward defendant himself, and are therefore subject to suppression. In *Boyer I*, we concluded, based on the record then before us, that regardless of the police illegality, the evidence there

---

[20] There is no evidence the officers specifically told Cornwell she had a right to refuse consent, but such advice is not essential to a finding of valid consent. (*Schneckloth*, *supra*, 412 U.S. 218, 231.)

[21] Defendant urges that even if the searching officers did not *actually* threaten to take Cornwell's children, the officers knew (by overhearing Cornwell's telephone statements to her lawyer, Ohanessian, and by one officer's direct telephone exchange with Ohanessian) that Cornwell *believed* such threats had been made. They therefore engaged in subtle "coercion," he insists, by doing nothing to allay Cornwell's fears. However, the issue is whether the officers obtained Cornwell's consent by "official coercion" (*Schneckloth*, *supra*, 412 U.S. 218, 229), i.e., by "threat," express or implied, or "force," overt or covert (*id.* at p. 228). While the subject's personal characteristics, including his or her "possibly vulnerable subjective [mental] state," are relevant, in the totality of circumstances, to whether the officers used coercive tactics (*id.* at p. 229), the subject's mere *perception* of coercion cannot support a finding of involuntary consent when, in fact, there was no coercion, plain or subtle. Were it otherwise, no search based on consent could be upheld against the subject's testimony that he or she *perceived* a threat. Moreover, we know of no case, and defendant has cited none, for the proposition that the police, *having made no threats*, express or implied, are guilty of "official coercion" (*id.* at p. 229) unless they take pains to disclaim threats merely *perceived* by the subject.

challenged (which did not include Cornwell's testimony) was nonetheless admissible because it would inevitably have been discovered by lawful means.

As previously noted, defendant complains that the instant trial court erroneously invoked the law of the case to foreclose full litigation of the issue of "taint," and to insulate the People from proving the evidence was not tainted. In any event, he urges, the existing record does not support a conclusion that the challenged evidence is untainted. The record does not show, he insists, that at every step, the police investigation was proceeding on a lawful track, which would "inevitably" have procured the evidence at issue, or that the means by which such evidence was obtained was otherwise "attenuated" from the original illegality. We nonetheless confirm our prior conclusion that the evidence under scrutiny was properly admissible.

 Evidence need not be suppressed as "fruit of the poisonous tree," though actually procured as the result of a Fourth Amendment violation against the defendant, if it inevitably would have been obtained by lawful means in any event. (*Nix v. Williams* (1984) 467 U.S. 431, 441–448 [81 L.Ed.2d 377, 104 S.Ct. 2501] (*Nix*).) Moreover, suppression is not necessarily required *even if* the evidence would not have come to light *but for* an infringement of the defendant's Fourth Amendment rights. (*Wong Sun v. United States* (1963) 371 U.S. 471, 487–488 [9 L.Ed.2d 441, 83 S.Ct. 407] (*Wong Sun*).)

Rejecting a strict "but for" test, the United States Supreme Court has admonished that in such cases, "the more apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" (*Wong Sun, supra,* 371 U.S. 471, 488.) "Under *Wong Sun*, evidence is not to be excluded merely because it would not have been obtained but for the illegal police activity. [Citation.] The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint. [Citation.]" (*People v. Caratti* (1980) 103 Cal.App.3d 847, 851 [163 Cal.Rptr. 265].)

 Relevant factors in this "attenuation" analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct. (*Brown v. Illinois* (1975) 422 U.S. 590, 603–604 [45 L.Ed.2d 416, 95 S.Ct. 2254] (*Brown*).) Where the testimony of live witnesses is at issue, the test focuses primarily on the effect of the

illegality on the witness's willingness to testify, and less on whether illegal conduct led to discovery of the witness's identity. (*United States v. Ceccolini* (1978) 435 U.S. 268, 276–277 [55 L.Ed.2d 268, 98 S.Ct. 1054].)

Granting, as we do, the prosecution's burden of proof on issues of attenuation, including inevitable discovery (See, e.g., *Nix, supra,* 467 U.S. 431, 447; *Dunaway v. New York* (1979) 442 U.S. 200, 204 [60 L.Ed.2d 824, 99 S.Ct. 2248]), we may nonetheless resolve such issues on appeal, even if not explicitly litigated below, if their factual bases are fully set forth in the record. (E.g., *People v. Robles* (2000) 23 Cal.4th 789, 801, fn. 7 [97 Cal.Rptr.2d 914, 3 P.3d 311]; *People v. Clark* (1993) 5 Cal.4th 950, 993, fn. 19 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*); *Green v. Superior Court* (1985) 40 Cal.3d 126, 137–138 [219 Cal.Rptr. 186, 707 P.2d 248] (lead opn. of Kaus, J.).) We conclude that such is the case here.

Defendant first contends there is no proof the police, lacking hard evidence of defendant's involvement in the Harbitz murders, would inevitably have sought Cynthia Cornwell's cooperation, including her consent to search the El Monte house. For a contrary inference, defendant stresses Detective Lewis's testimony that, on December 14, 1982, if defendant had not been home and if Cornwell had proven uncooperative, Lewis would simply have gone away.

However, as we noted in *Boyer I,* "[l]acking a ready suspect for two brutal homicides, the police were pursuing a broad-based investigation of every person who might possibly be involved." (*Boyer I, supra,* 48 Cal.3d 247, 278; see also *People v. Carpenter* (1999) 21 Cal.4th 1016, 1040 [90 Cal.Rptr.2d 607, 988 P.2d 531] [noting "sheer size and scope of the investigation" as factor bearing on inevitability that evidence would be discovered].) Information received from William Harbitz had focused particular suspicion on defendant. The police evidenced this suspicion, and their intent to pursue it, in numerous ways. Detectives learned where, and with whom, defendant lived. They surrounded his El Monte home, detained him, and asked him to accompany them to the Fullerton police station for an interview. When they departed with defendant, they left officers behind in El Monte, poised to commence a search of the house if the opportunity presented itself.

Then, *before defendant had said anything incriminating that might further isolate him as a suspect,* the police asked for his consent to search the El Monte house.[22] When defendant said it was up to Cornwell, they immediately

---

[22] Before being transported to the Fullerton station on the evening of December 14, 1982, and before hearing his *Miranda* rights, defendant mentioned that, earlier in the week, he had used a car belonging to the mother of his friend John Kennedy to visit *his own parents* in La Mirada. (*Boyer I, supra,* 48 Cal.3d 247, 277.) While the La Mirada destination was relatively

pursued that avenue by dispatching the officers who were standing by in El Monte to request Cornwell's permission. Under these circumstances, the record sufficiently establishes that, aside from their illegal detention and interrogation of defendant, the police meant to search the house, and to do so with the permission of an authorized consenter if possible.

Defendant next urges the evidence fails to show that, absent the illegal police conduct against defendant, Cornwell would inevitably have *consented* to the search. We need not resolve this question directly because, even if Cornwell's consent was not "inevitable"—i.e., even if, in the strictest sense, it might not have been obtained "but for" the illegal conduct—it was nonetheless sufficiently attenuated from the primary illegality to purge any taint. (*Wong Sun, supra,* 371 U.S. 471, 477–488.)

When the accused claims a consent to search is tainted by a prior Fourth Amendment violation, mere voluntariness of the consent is not enough to dissipate the taint. (E.g., *United States v. Bautista* (9th Cir. 2004) 362 F.3d 584, 592; *U.S. v. Richard* (5th Cir. 1993) 994 F.2d 244, 252 (*Richard*).) In such cases, we must additionally examine the "attenuation" factors set forth in *Brown, supra,* 422 U.S. 590, to determine whether, on the particular facts, the twin purposes of the "poisonous fruit" rule—to deter the exploitation of official misconduct and to promote judicial integrity—are outweighed by the cost of excluding the challenged evidence.

We first consider temporal proximity. The request for Cornwell's permission to search occurred several hours after defendant was taken to the Fullerton police station. In the meantime, Cornwell was left alone. The substantial lapse of time between the Fourth Amendment violation and the challenged consent weighs in favor of a finding that any taint had dissipated.

Moreover, significant intervening events separated the Fourth Amendment violation against defendant from Cornwell's later voluntary consent to search. For one thing, discussions with Cornwell about obtaining her permission for the search occurred at a location remote from where defendant was being detained illegally. (Compare, e.g., *Richard, supra,* 994 F.2d 244, 252 [finding, as a significant intervening circumstance, that consent provided, in noncoercive circumstances, by defendant's girlfriend was remote in time and place from invalid consent given by defendant himself; taint deemed purged even though girlfriend was told that defendant had given consent].)

---

near the murder scene (*ibid.*), there is nothing to indicate that this remark, made at this stage of the investigation, further aroused police interest in defendant as a suspect in the Harbitz murders.

Moreover, Cornwell was permitted to consult not only with defendant,[23] but with an attorney, before deciding whether to allow the search. Cases have stressed that the opportunity for legal consultation is critically important in determining whether a consent to search was purged of the primary taint of a prior Fourth Amendment violation. Closely on point in this regard is *United States v. Wellins* (9th Cir. 1981) 654 F.2d 550. There, police illegally entered the defendant's hotel suite, illegally conducted a "sweep search" of the premises, and illegally arrested him. He then consented to a more complete search after he was allowed, in the officers' presence, to speak with his attorney by telephone. On appeal, the court deemed this factor "dispositive" in determining that the consent was sufficiently attenuated by intervening events from the prior illegal conduct, and therefore valid. (*Id.* at p. 555.) Similar reasoning applies here.[24]

Finally, the police erred seriously by subjecting defendant to an illegal custodial interrogation without a warrant or probable cause for his arrest. As a consequence, all resulting statements obtained from defendant have been suppressed. (*Boyer I, supra,* 48 Cal.3d 247, 275.) Nonetheless, we do not deem the misconduct against *defendant* so "flagrant" as to require suppression of evidence obtained as a result of *Cornwell's* later voluntary consent to search. It does not appear the one had any strong bearing on the other. Cornwell did not suggest her consent was influenced by the fact of defendant's illegal arrest, and her consent was obtained by means essentially independent of the specific illegalities committed against defendant. Accordingly, we conclude the consent was not " 'come at by . . . exploitation of [the primary] illegality, [but] by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun, supra,* 371 U.S. 471, 488.) That being so, the

---

[23] It is true that Cornwell's conversation with defendant occurred while *he* was still in police custody, and this may marginally weigh against a finding of attenuation. Still, that fact seems to have had little bearing on the consent ultimately obtained from Cornwell. In the conversation, defendant simply told her that it was her decision. Cornwell never testified that defendant's illegal custodial status had any bearing on her decision to consent. On appeal, defendant speculates vaguely about the possibility of a police "conspiracy" to enlist his aid in obtaining Cornwell's consent. But he never raised any such theory below, and the record belies it by demonstrating that he provided no such aid—he simply professed neutrality.

[24] (See also, e.g., *United States v. Washington* (9th Cir. 2004) 387 F.3d 1060, 1073–1074 [where defendant's consent occurred shortly after police illegally arrested him and viewed interior of his hotel room, his signature on consent form advising of right to refuse consent did not substitute, as significant intervening event, for appearance before a magistrate or consultation with an attorney]; *United States v. McCoy* (D.Or. 1993) 839 F.Supp. 1442, 1447 [consent to search given by defendant's handcuffed girlfriend, minutes after both were illegally called out of their home and arrested, was not purged of primary taint; brief opportunity to consult with family members was not akin to consultation with attorney that might constitute significant intervening circumstance]; also cf. *United States v. Kelley* (5th Cir. 1993) 981 F.2d 1464, 1471–1472 [even if "seat belt" detention and questioning of defendant driver was illegal, at-the-scene consent to search vehicle by its owner—passenger was purged of primary taint by police advice of her right to refuse consent].)

cost of excluding the highly relevant evidence thereby obtained outweighs the deterrent value of suppressing it.[25]

We remain persuaded, as in *Boyer I*, that once Cornwell did validly consent to the search of the El Monte house, the challenged testimony and physical evidence would inevitably have been procured. When alerted that defendant had indicated where to find the Levi's and knife, officers were already searching the bedroom in which these articles were located. Because both items contained blood, no competent officer would have overlooked them in any event. (*Boyer I, supra*, 48 Cal.3d 247, 277, fn. 18.) The subsequent forensic analyses would have confirmed their evidentiary significance to the case.

As defendant observes, he also told police he had worn the blue jacket on the night of the Harbitz murders, and this led the searching officers to ask Cornwell about it. However, they inevitably would have come upon the jacket evidence anyway. A thorough and competent search of the El Monte house could hardly have missed the unusual spectacle, in plain view, of a hibachi containing scraps of recently burned clothing, sitting atop the kitchen stove. Cornwell testified in the prior trial that " 'little pieces of [the] jacket' " were still " 'flying around' " " 'in the kitchen.' " (*Boyer I, supra*, 48 Cal.3d 247, 278, fn. 20, italics omitted.)

Furthermore, even without defendant's confession or the details supplied by him, the police would have grasped the potential criminal significance of the obvious fact that Cornwell had burned this item. Common sense did not readily disclose an innocent reason for doing so. Accordingly, competent officers would have inquired, as they did. Cornwell's implausible explanation, that she burned the jacket, without informing defendant, because she intended to buy him a new one, would only have increased police suspicion.

---

[25] Defendant claims the police misconduct here was more egregious than in *People v. Superior Court (Casebeer)* (1969) 71 Cal.2d 265 [78 Cal.Rptr. 210, 455 P.2d 146] (*Shasta County*), a case in which we found that a consent to search was not attenuated from a prior illegality. There, during a traffic stop, a highway patrol officer illegally searched a passenger's purse, finding a small quantity of marijuana. He held the remaining occupants of the stopped car at the scene for 30 minutes, without explanation, while backup officers arrived. Then he approached the vehicle and asked another passenger, the owner, for consent to search the car. That search disclosed larger quantities of marijuana, leading to drug charges against the driver. On those particular facts, we found a "straight" road from the first illegal search to the subsequent consent, declining to hold, under the circumstances, that the 30-minute hiatus between the two events was sufficient attenuation. (*Id.* at p. 274.) Here, by contrast, there is no evidence that the illegal police conduct toward defendant was the impetus for the decision to attempt to search the El Monte house. The request for Cornwell's consent came hours after defendant had been transported to the Fullerton station, and at a residential location remote from the detention; Cornwell was left free and unmolested in the meantime. She was allowed to consult an attorney before deciding whether to consent. Nothing in *Casebeer* precludes us from finding Cornwell's consent valid.

Moreover, officers already had, or shortly would have, found the bloody Levi's and defendant's knife containing traces of human blood. These incriminating items tightened the evidentiary net around defendant and cast further doubt on the innocent nature of Cornwell's action. In addition, the police knew she had burned the jacket immediately after he was taken from the El Monte house to the Fullerton police station. The timing of her act enhanced the compelling inference that she was destroying evidence.[26]

Under these circumstances, the police undoubtedly would have pressed the issue by explaining to Cornwell her vulnerability as an accessory. Most likely they would have arrested her at that time, as they did. But even if not, they certainly would have taken such action as soon as forensic analysis revealed that the Levi's recovered from the El Monte house contained blood consistent with that of the murder victims. Cornwell conceded that her arrest and the legitimate threat of prosecution as an accessory to murder were the prime factors leading to her cooperation and eventual testimony.[27]

Finally, defendant insists there is no proof Kennedy would inevitably have been found, or his testimony procured. However, it appears manifest that once Cornwell agreed to cooperate, police would inevitably have learned of Kennedy's involvement and obtained his cooperation. As she testified in both trials, Cornwell knew Kennedy had left and returned with defendant on the night of the murders. She undoubtedly would so have informed the police. Kennedy's telephone number was written down at the El Monte house. His address was traced from the telephone number. (*Boyer I, supra,* 48 Cal.3d 247, 277.)

Defendant asserts that Kennedy's cooperation cannot be deemed automatic, especially in light of the fact that he "lied" to the police when they first spoke with him. But the record belies defendant's argument in several respects. At

---

[26] The evidence does not indicate that if Cornwell meant to destroy evidence, she did so *only because* of the illegal police activities on the night of December 14, 1982. Cornwell testified in the retrial itself that when defendant left the El Monte house with Kennedy on December 7, he was wearing the blue jacket. When the two men returned, Cornwell recounted, defendant's Levi's were bloodstained, and he had a wound in his knee, for which he gave a suspicious explanation. Cornwell also indicated that earlier on December 14, defendant seemed upset after receiving a telephone call from his mother; when Cornwell asked what was wrong, defendant said "something about a murder" and told Cornwell "you are going to hate me." Shortly thereafter, the police arrived and departed with defendant, leaving nobody behind to secure the premises. Thus, at most, they merely gave Cornwell the *opportunity* to get rid of an item she already had every reason to suspect was evidence in a murder case.

[27] We need not give dispositive effect to Detective Lewis's testimony that it would not have been appropriate to arrest anyone as an accessory for burning the jacket until after defendant confessed. Lewis was suggesting, at most, that other evidence of defendant's guilt would have been required. Forensic analysis of the bloody Levi's would inevitably have produced such evidence.

the prior trial, there was evidence that as soon as the police told Kennedy they suspected his involvement, he " 'became visibly shaken and stated that he didn't want to go to jail on that type of thing.' " (*Boyer I, supra*, 48 Cal.3d 247, 277.) At the 1992 retrial, Kennedy did testify that when detectives first contacted him, they simply told him defendant claimed to have borrowed a car belonging to Kennedy's mother, and Kennedy did not contradict them. However, Kennedy insisted, he later contacted the police on his own initiative and *asked* them to return for another interview, because he "wanted to tell them the truth." As a result of this second interview, in which Kennedy admitted he was with defendant on the night of the murders, Kennedy was arrested, and he gave the statements leading to his immunized testimony at trial.

 In sum, the record, as augmented by the retrial suppression hearing, demonstrates that the physical and testimonial evidence introduced against defendant was not the product of improper coercion, and would inevitably have been obtained, or was otherwise procured by means sufficiently attenuated from the Fourth Amendment violation committed against defendant. Hence, we affirm our conclusion in *Boyer I, supra*, 48 Cal.3d 247, that this evidence was not suppressible.

### B. *Kennedy's immunity agreement.*

John Kennedy testified for the prosecution pursuant to an immunity agreement. Defendant claims the agreement was improperly coercive, in that it obliged Kennedy, as a condition of immunity, to testify in strict accordance with certain prior statements he gave the police. Admission of this coerced testimony, defendant avers, violated his Fifth and Fourteenth Amendment rights to due process; his Sixth Amendment rights to a fair trial, fair cross-examination, and a jury trial; and his Eighth and Fourteenth Amendment rights to reliability in the guilt and sentencing phases of a capital trial. (See, e.g., *People v. Riel* (2000) 22 Cal.4th 1153, 1179 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *Allen, supra*, 42 Cal.3d 1222, 1251.)

At the outset, defendant has forfeited the claim by failing to raise it below. In both trials, defendant urged that Kennedy's testimony was the "tainted fruit" of illegal police conduct *against defendant* (see text discussion, *ante*), but defendant never asserted, until now, that the immunity agreement was coercive *as to Kennedy* for the reasons advanced in this appeal. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612 [31 Cal.Rptr.3d 160, 115 P.3d 472].)[28]

---

[28] Defendant urges that, despite the lack of a specifically focused objection, the issue was before the court by virtue of defense counsel's cross-examination of Kennedy concerning the terms of the grant of immunity. (See text discussion, *post*.) We disagree. This examination, in the course of Kennedy's trial testimony, was intended only to impeach Kennedy's credibility

Moreover, defendant's argument on appeal is clearly meritless. Defendant has materially mischaracterized the agreement at issue.

The written immunity agreement, entered before the original trial, said Kennedy had been told that he would not be prosecuted for "any act or fact concerning which [he] was required to testify in this case," but that "this immunity does not extend to any false testimony that may be given under oath by [him] in this case, which testimony would make [him] subject to prosecution for perjury." Further, the agreement stated, "*the witness has represented* that [his] testimony . . . will be in substance as follows: Consistent with the tape recorded statements given to Fullerton Police Department, Detective Lewis, on December 17, 1982, . . . and December 20, 1982, . . . [t]ranscriptions of which are attached hereto and incorporated by reference." At the preliminary hearing, the magistrate explained to Kennedy that, under the agreement, "the District Attorney can prosecute if they find that you have lied, prosecute you for perjury."

During cross-examination of Kennedy at the retrial, defense counsel asked Kennedy whether it was explained to him, in court proceedings concerning the immunity agreement, "that if your testimony was inconsistent with what you had been telling the District Attorney . . . that all bets were off and you could be prosecuted for this case again." Kennedy replied, "Yes." On redirect, however, the prosecutor asked Kennedy whether "you [were] ever told anything by a member of the District Attorney's office other than to testify truthfully," and whether "you [were] ever told what to testify to or how to testify." Kennedy answered both questions "[n]o."

A prosecutor may grant immunity from prosecution to a witness on condition that he or she testify truthfully to the facts involved. (*People v. Green* (1951) 102 Cal.App.2d 831, 838–839 [228 P.2d 867].) But if the immunity agreement places the witness under a strong compulsion to testify in a particular fashion, the testimony is tainted by the witness's self-interest, and thus inadmissible. (*People v. Medina* (1974) 41 Cal.App.3d 438, 455 [116 Cal.Rptr. 133].) Such a "strong compulsion" may be created by a condition " 'that the witness not materially or substantially change her testimony from her tape-recorded statement already given to . . . law enforcement officers.' " (*People v. Medina, supra,* 41 Cal.App.3d at p. 450.)

On the other hand, we have upheld the admission of testimony subject to grants of immunity which simply suggested the prosecution *believed* the prior statement to *be* the truth, and where the witness understood that his or her sole obligation was to testify fully and fairly. Thus, in *People v. Fields* (1983)

---

before the jury. The defense never asked the trial court to *exclude* or *strike* Kennedy's testimony on grounds that his grant of immunity was improperly coercive.

35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680] (*Fields*), defense counsel elicited from a prosecution witness that her immunity was conditioned on testimony consistent with her prior statement. On redirect, however, the witness made clear that her prior statement *was* the truth, that the prosecutor had asked her to testify to the truth, and that she was never asked to testify to a certain story. (*Id.* at pp. 359–360.) As we explained, the record suggested, at most, that the witness understood she was obliged to recount her prior statement *because it was the truth*. We found the evidence insufficient to conclude that the grant of immunity required the witness to testify in accord with a prior statement *regardless* of its truth. (*Id.* at pp. 360–361.)

Similarly, in *People v. Garrison* (1989) 47 Cal.3d 746 [254 Cal.Rptr. 257, 765 P.2d 419] (*Garrison*), witness Roelle's plea agreement, as disclosed at his preliminary hearing, provided that Roelle would testify truthfully at Garrison's trial, and that " 'a further part of this . . . agreement is that . . . [Roelle] has already truthfully stated to the investigating detectives what happened in this case.' " (*Id.* at p. 768, italics omitted.) Roelle's counsel advised the court that Roelle had passed a polygraph examination, and the prosecutor examined Roelle on voir dire to confirm the latter's understanding that, as part of his bargain, " 'he [was] going to come in and tell the truth about what happened.' " (*Ibid.*)

On this record, we declined to accept the premise that Roelle's bargain was conditioned on the truthfulness of his prior statements. Rather, we noted that as in *Fields*, "the record does not demonstrate either that the plea bargain required Roelle to testify in accord with his statement regardless of its truth, or that Roelle so understood the agreement." Instead, we observed, "the record reflects that the district attorney and Roelle's counsel sought to ensure that the record reflected the factual basis for their belief that permitting Roelle to plead guilty to the lesser charges would be appropriate in light of their understanding of his actual involvement in the offenses." (*Garrison, supra*, 47 Cal.3d 746, 770.) We held that "unless the bargain is *expressly contingent* on the witness sticking to a particular version, the principles of [*People v.*] *Medina, supra*, 41 Cal.[App.]3d 438, and [*People v.*] *Green, supra*, 102 Cal.App.[2d] 831, are not violated." (*Garrison, supra*, at p. 771, italics added.)

That reasoning governs here. The grant of immunity to Kennedy, by its terms, was based on his truthful testimony, which Kennedy himself "represented" would be in accordance with his prior statements. Thus, the agreement simply reflected the parties' mutual understanding that the prior statements *were* the truth, not that Kennedy must testify consistently with those statements regardless of their truth. Kennedy so confirmed on the

stand.[29] Accordingly, Kennedy's testimony was not rendered inadmissible by the terms of his grant of immunity.

### C. *Cornwell's immunity agreement.*

Defendant makes similar arguments concerning Cornwell's grant of immunity, and we reach the same results. As with Kennedy, the defense never objected below that Cornwell's testimony should be excluded because her immunity agreement improperly forced her to testify to a certain version of events regardless of its truth. Hence, the claim is forfeited.

It is also meritless. Cornwell's grant of immunity, like Kennedy's, specified that the immunity did not extend to false testimony, which could make the witness subject to prosecution for perjury. The immunity agreement also stated that "the witness represented that the testimony of the witness *will be truthful and* in substance as follows: consistent with the statements and information given to the Fullerton Police Department Investigation Officers in the attached reports. . . ." (Italicized words added by handwritten interlineation.) At the suppression hearing on retrial, Cornwell indicated she understood that if she testified falsely, she could be prosecuted for perjury, and she insisted that she had testified truthfully, pursuant to this agreement, at the prior trial.

Thus, Cornwell's grant of immunity, like Kennedy's, simply reflected the parties' mutual understanding that the information the witness had previously supplied to the police was truthful, not that the witness had to iterate her prior statements, regardless of their truth. The witness confirmed her understanding that, to retain immunity, she must testify truthfully. As discussed above, at the retrial suppression hearing, Cornwell implied that her testimony was obtained by improperly coercive police and prosecutorial tactics. We have rejected that claim. (See text discussion, *ante,* pp. 444–445.) Nothing in Cornwell's assertions on this subject implies she was coerced to testify falsely, or to a particular version of events, in return for immunity. Cornwell's testimony was not subject to exclusion on the ground now asserted.[30]

---

[29] Indeed, Kennedy's trial testimony departed from the specified statements in at least one significant respect. In his taped police interviews of December 17 and December 20, 1982, Kennedy consistently denied that he had consumed any drugs before he drove defendant to the Harbitzes' residence on December 7, 1982, and he also stated he did not see defendant do so. At the retrial, by contrast, he testified that he and defendant injected cocaine together before proceeding to the victims' residence. (See text discussion, *ante,* p. 421.)

[30] Defendant posits that the presumed reliability of immunized testimony, and the ability of informed juries to assess such reliability, are "legal fictions." Hence, he argues, as to both Kennedy and Cornwell, that (1) their testimony should have been excluded because it was improperly obtained in return for promises of leniency, and (2) the Eighth Amendment's

## IV. Guilt Trial Issues

### A. *Defendant's statements to defense mental health experts as "fruit of the poisonous tree."*

Defendant urges the trial court wrongly allowed the prosecutor, at the 1992 guilt trial, to cross-examine the defense mental health expert, Dr. Klatte, about damaging statements defendant made to other experts who were consulted by the defense prior to the original trial but after the erroneous denial of defendant's motion to suppress his confession to the police. Defendant insists that if the confession had been suppressed in advance of the original trial, as should have occurred (*Boyer I, supra,* 48 Cal.3d 247, 267–275), these experts would not have been consulted, and their reports or testimony containing defendant's damaging statements would thus not have been available for use in cross-examining Dr. Klatte.

Accordingly, defendant argues, this material was the "tainted fruit" of his confession obtained in violation of his rights under the Fourth Amendment and *Miranda v. Arizona, supra,* 384 U.S. 436. As such, he insists, it could not be used to impeach a defense witness. (Citing *James v. Illinois* (1990) 493 U.S. 307 [107 L.Ed.2d 676, 110 S.Ct. 648] (*James*).) Defendant asserts violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. We reject the contention.

#### 1. *Factual and procedural background.*

The issue arises in the following factual context: Dr. Klatte was called by the defense at the 1992 guilt trial to testify concerning defendant's probable mental state during the attack on the Harbitzes. As a basis for his expert opinion, Dr. Klatte testified at length about defendant's descriptions of these events obtained in the course of their interviews.

Just before Dr. Klatte took the stand, defendant's counsel moved in limine to preclude cross-examination of the witness about defendant's statements contained in reports and testimony of other experts consulted by the defense prior to the original trial. Counsel represented as follows: In advance of the first trial, after the motion to suppress defendant's confession was erroneously denied, the defense "had to make some decisions." The defense consulted psychiatrists Dr. Loomis and Dr. Kaufman, who interviewed defendant,

---

concern for reliability in capital cases required the trial court, before admitting immunized testimony, to make special findings that it contained particularized guarantees of trustworthiness. The contentions are forfeited because they were not raised in the trial court. In any event, they lack support in the case law and run contrary to well-settled precedent that grants of immunity conditioned solely on truthful testimony are valid.

obtained information from him, and wrote reports. Counsel supplied these reports to Dr. Klatte, "who was [also] involved in the case back then." If the motion to suppress had been granted, "defendant wouldn't have gone to—and talked to" Dr. Loomis and Dr. Kaufman, and counsel would not have furnished their reports to Dr. Klatte. Moreover, the defense would not have put psychopharmacologist Dr. Siegal on the stand at the prior trial, thus making available, for use in cross-examining Dr. Klatte, Dr. Siegal's report and testimony containing statements made to him by defendant.

Counsel argued that because the reports and testimony of Dr. Loomis, Dr. Kaufman, and Dr. Siegal were thus "tainted fruit" of defendant's invalid confession, their use to impeach Dr. Klatte would violate defendant's Fourth and Fifth Amendment rights. The trial court denied the motion to limit cross-examination, ruling that while the prosecution could not use defendant's statement *to the police* to impeach a defense witness, statements voluntarily made by defendant to defense experts could be used to cross-examine Dr. Klatte as to the basis for his expert opinion.[31]

On direct examination, Dr. Klatte testified, among other things, that in 1990, appellant said he was "tripping" at the Harbitz residence, felt like he was in the movie Halloween II, and "actually hallucinated a man coming at him with a knife." However, Dr. Klatte related, in earlier interviews, in 1982 and 1983, defendant did not mention this hallucination. Hence, Dr. Klatte stated, he did not use the "hallucination" statement to form any conclusions about defendant's mental state at the time of the homicides, "because I felt if he hadn't told me the first time, I wasn't sure that it was true."

Dr. Klatte also recounted claims by defendant about his drug history and the drugs he consumed on December 7, 1982. According to Dr. Klatte, defendant said that around the time of the murders, he had for some time been injecting cocaine almost daily, and was drinking considerably. Defendant indicated that, on the day of the murders, he drank a fair amount of beer in the morning, ingested a half-pint of whiskey in the afternoon, and smoked a PCP cigarette. He also confirmed sharing a quarter-gram of cocaine with Kennedy.

Dr. Klatte noted that cocaine use can make people aggressive, impulsive, and manic, and that those who use cocaine over a long period can become psychotically paranoid and delusional. He also explained that PCP ingestion is associated with distorted perception, hallucinations, and "very aggressive,

---

[31] The court also denied a defense objection, under Evidence Code section 352, that the challenged impeachment evidence was more prejudicial than probative, but did so without prejudice to renewal of the motion in the course of Dr. Klatte's testimony. The motion was not renewed, and defendant does not claim error on that basis.

explosive kinds of behavior." Dr. Klatte opined that if defendant told the truth about the drugs he ingested on December 7, 1982, he would be acting thoughtlessly and explosively and could misinterpret events around him. Moreover, Dr. Klatte indicated, defendant's ingestion of PCP on the day of the murders "might" have caused him to hallucinate.

On cross-examination by the prosecutor, Dr. Klatte admitted that defendant has an antisocial personality, and that one would "highly suspect" malingering by such a person seeking a diagnosis for use in a murder trial. Dr. Klatte agreed that this suspicion would "go even stronger" upon hearing something different from defendant in 1990 (i.e., the hallucination claim) than "from his same mouth in '82 and '83." Dr. Klatte also acknowledged that, despite defendant's claims of drug-induced hallucinations and memory loss, much of his activity on the night of the murders seemed directed toward obtaining money for drugs.

The prosecutor examined Dr. Klatte at some length on the report and prior testimony of Dr. Siegal. The thrust of this examination was that, in contrast to the relatively sketchy drug-use information defendant gave Dr. Klatte, defendant had provided Dr. Siegal a more detailed account indicating that, since adolescence, he had been a serious, chronic abuser of many illegal substances. The prosecutor apparently sought to show that if defendant did not tell Dr. Klatte (or if Dr. Klatte did not learn) the whole truth about defendant's drug history, Dr. Klatte's final conclusions about the effect of drugs on defendant's conduct might be similarly flawed. More specifically, the prosecutor also sought to undermine Dr. Klatte's basic opinion—that defendant might have killed the Harbitzes because he was under the *influence* of drugs—by suggesting grounds for an inference that defendant simply robbed and killed the Harbitzes to get *money* for his chronic drug habit.

Dr. Klatte responded by noting that, while he did not recall everything in Dr. Siegal's report and testimony, Dr. Siegal's account was generally consistent with Dr. Klatte's own understanding of defendant's drug background. Dr. Klatte also iterated that defendant's antisocial personality, and his consequent capacity for lying and malingering, had come through "loud and clear" in their face-to-face interviews.

The prosecutor also asked whether Dr. Klatte recalled that when Dr. Siegal suggested to defendant he might have been playing the role of the character "Michael Myers" in Halloween II, defendant denied doing so. Dr. Klatte said he did not recall that. Finally, on recross-examination, the prosecutor queried whether Dr. Klatte agreed with Dr. Kaufman "that the hallucination and flashback is unlikely." In response, Dr. Klatte said he "wasn't convinced that [defendant] actually hallucinated."

Citing the "poisonous tree" analysis of *James, supra,* 493 U.S. 307, the defense proposed an instruction that evidence elicited on cross-examination of Dr. Klatte about what defendant told Dr. Siegal and Dr. Kaufman should be disregarded. The instruction was refused.

In his argument to the jury, the prosecutor posed the rhetorical question why, if there was corroboration for what defendant told Dr. Klatte, the defense had not called the psychopharmacologist, Dr. Siegal. Defendant objected that this was inappropriate comment on defendant's failure to call witnesses, and might also be "compound[ing]" what "is already error" under *James.* The objection was overruled. The prosecutor then remarked, "If the defendant had that much to say about psycho—about the drugs and everything, the psychopharmacologist, we would have heard about it."

### 2. *Discussion.*

As indicated above, defendant insists that the defense decisions to have Dr. Kaufman and Dr. Siegal interview defendant and prepare reports, to furnish Dr. Kaufman's report to Dr. Klatte, and to put Dr. Siegal on the stand in the prior trial were dictated by the erroneous denial, in the earlier proceedings, of his motion to suppress his illegally obtained confession. Hence, defendant urges, those reports and testimony were "tainted fruit" of the illegal police conduct, and thus could not be used to impeach Dr. Klatte. For multiple reasons, we disagree.

In the first place, the factual premise upon which defendant relies is dubious. Prior to the original trial, defendant's motion to suppress was denied *in its entirety.* This allowed *not only* defendant's confession, but *other strong evidence of his identity as the Harbitzes' killer* (including the testimony of Cornwell and Kennedy, and the incriminating physical evidence recovered from the El Monte house) to be introduced against him. As we later concluded in *Boyer I, supra,* 48 Cal.3d 247, and in the instant appeal (see discussion, *ante,* pp. 444–445), this other evidence *was properly admitted.* We find it difficult to infer that the tactical decisions defendant identifies were made *solely* on the basis of the improperly admitted confession.[32]

---

[32] Defendant's factual claims are further undermined by his concession that Dr. Klatte was also involved in the case prior to the original trial. Because Dr. Klatte appeared as a defense witness in the retrial, from which the illegal confession was excluded, there obviously is no claim that *his* involvement is only as a result of the erroneous earlier failure to suppress the confession. On retrial, the defense also presented testimony by a psychopharmacologist, Dr. Plon. Thus, the illegal confession aside, the defense has consistently perceived the need to explore, and ultimately to present, evidence that the killings were committed while defendant was in an altered mental state influenced by the ingestion of drugs. In substance, defendant's dilemma is simply that he prefers some of the expert opinions he obtained over others.

In any event, the trial court's ruling was correct. On direct examination, Dr. Klatte was allowed to describe statements made to him by defendant as matters considered by Dr. Klatte in forming his expert opinion of defendant's mental state. (Evid. Code, § 802; see *People v. Montiel* (1993) 5 Cal.4th 877, 918–919 [21 Cal.Rptr.2d 705, 855 P.2d 1277] (*Montiel*).) Accordingly, under general evidentiary principles, the prosecution could challenge the credibility of that opinion by confronting Dr. Klatte with defendant's inconsistent statements to other defense experts, as included in testimony or reports to which Dr. Klatte had access in forming his own conclusions. (See Evid. Code, § 771, subd. (b); *Montiel, supra,* at pp. 923–924.) Defendant concedes as much.

However, defendant claims defendant's statements to Dr. Kaufman and Dr. Siegal were nonetheless inadmissible to impeach Dr. Klatte because they were the "tainted fruit" of his illegal confession. We disagree.

Under certain circumstances, evidence obtained in violation of the defendant's rights, though unavailable for use in the prosecution's case-in-chief, can be used to impeach an accused who elects to testify in his or her own behalf. (See *United States v. Havens* (1980) 446 U.S. 620 [64 L.Ed.2d 559, 100 S.Ct. 1912]; *Oregon v. Hass* (1975) 420 U.S. 714 [43 L.Ed.2d 570, 95 S.Ct. 1215]; *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]; *Walder v. United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354].) In such cases, the interest in deterring illegal police conduct is not sufficient to accord the defendant a license to commit perjury.

However, in *James, supra,* 493 U.S. 307, the court held that the impeachment exception to the exclusionary rule does not apply to defense witnesses other than the defendant himself. The court explained that the concern with perjury in such cases is insufficient to allow the state to "brandish" illegally obtained evidence as a sword to chill defendants "from presenting their best defense—and sometimes any defense at all—through the testimony of others." (*Id.* at pp. 314–315.) Moreover, the court indicated, extending the "impeachment" exception beyond the narrow confines of the accused's own testimony to all defense witnesses would unduly encourage police misconduct by preserving a broad area in which the evidence could be used despite its illegal procurement. (*Id.* at pp. 317–319.)

Though defendant insists otherwise, that reasoning has no application here. Dr. Klatte was not cross-examined with evidence illegally obtained by the police. Defendant and his counsel created the basis for impeachment themselves by their voluntary decisions to consult Dr. Kaufman and Dr. Siegal, obtain reports from these experts, furnish the reports to another defense expert, Dr. Klatte, present Dr. Siegal's testimony in the prior trial, and have Dr. Klatte himself testify in the retrial.

Defendant urges that probative material is not free of taint in prosecution hands simply because it came into being as the result of tactical decisions by the defense, if the defense's motivation was to counter the prosecution's use of illegally obtained evidence. Thus, defendant notes, an accused's *own testimony* may be tainted by illegal police conduct if the *reason* he took the stand was to rebut his wrongfully obtained extrajudicial statements introduced against him by the prosecution. (*Harrison v. United States* (1968) 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008]; see *Boyer I, supra,* 48 Cal.3d 247, 280; *People v. Spencer* (1967) 66 Cal.2d 158, 164 [57 Cal.Rptr. 163, 424 P.2d 715].) In such a case, as *Harrison* explained, the testimony is itself "the fruit of the poisonous tree, to invoke a time-worn metaphor." (*Harrison, supra,* at p. 222.)

The situation before us, however, is a far cry from the one presented in *Harrison.* In a case like that, the prosecution seeks, in effect, to circumvent the invalidity of an illegal confession, and to obtain its full benefit, by arguing that the defendant provided similar information through live testimony he was forced to give *because the confession was introduced against him.*

Here the prosecution did not seek to profit from defendant's wrongly admitted confession by pointing to testimony, or other evidence, defendant himself felt forced to introduce in order to counter the confession's effects. Instead, the prosecutor cross-examined a defense expert—whose testimony was voluntarily proffered in a retrial from which defendant's illegal confession *had been excluded*—about the foundation for the expert's opinion. The basis for impeachment was not the confession, or any testimony defendant gave in direct consequence thereof, but otherwise pertinent and admissible evidence generated by the defense as part of its own preparation for the prior trial.

It would stretch the "tainted fruit" doctrine beyond breaking to hold that this witness, presented by the defense in a trial free of the illegal confession, may escape impeachment with information voluntarily compiled by the defense itself, and may thus assume a misleading aura of credibility, simply because the defense obtained the self-damaging information out of concern that the prosecution would introduce the confession in an earlier trial. In no meaningful sense did the prosecution "come at" the challenged impeachment evidence by "exploitation" of the "primary illegality" of defendant's confession. (*Wong Sun, supra,* 371 U.S. 471, 488.) Denying the prosecution the use of the impeachment evidence in this attenuated context[33] would significantly

---

[33] Defendant insists there is no "independent intervening act" sufficient to break the causal chain between the illegal confession and the prosecution's use of the challenged impeachment evidence, and thus dissipate the taint. (Citing *People v. Sims* (1993) 5 Cal.4th 405, 445 [20

undermine the truth-seeking process while having a negligible deterrent effect on police misconduct. We decline to strike that balance.[34]

In a related aside, defendant suggests he was somehow denied his Sixth Amendment rights to present witnesses in his defense, and to the effective assistance of counsel, insofar as he was unable to call other experts, such as Dr. Siegal, for fear *they* would be impeached in violation of the *James* rule, as Dr. Klatte purportedly was. Moreover, defendant complains, this disability was improperly exploited by the prosecutor in his remarks to the jury. The argument is nonsense.[35] That defendant might *originally* have consulted those experts in consequence of defendant's illegal confession has no bearing on his ultimate decision whether to call them in a later trial from which the confession was excluded. And defendant fails to explain how they could be "impeached" with their own "tainted" evidence. We reject the claim.

Finally, even if we found error, we would discern no prejudice under any applicable standard. Dr. Klatte made clear that, independent of the reports and testimony of Dr. Kaufman and Dr. Siegal, he seriously questioned the veracity of defendant's "hallucination" claim. Moreover, he indicated that the drug history recounted by Dr. Siegal essentially conformed to his own understanding and did not alter his conclusions. No basis for reversal of defendant's convictions appears.

B. *Failure to give limiting instruction on proper use of defendant's statements to defense experts.*

Defendant urges the trial court erred in failing to instruct the jury, such as by CALJIC No. 2.10,[36] that his statements to the defense experts, as disclosed by the testimony of Dr. Klatte, could not be considered for their

---

Cal.Rptr.2d 537, 853 P.2d 992].) On the contrary, the defendant's decision to present Dr. Klatte as an expert witness in a trial free of the illegal confession amply serves that purpose. Under such circumstances, defendant simply cannot insulate this witness from damaging impeachment with information defendant himself voluntarily provided to other defense experts.

[34] As the People point out, at least one decision has held that *James, supra,* 493 U.S. 307, does not preclude the impeachment of a defense *expert* with defendant's *suppressed statement to the police. (Wilkes v. United States* (D.C. 1993) 631 A.2d 880, 885–891.) This case is several steps removed even from that scenario.

[35] It is also disingenuous in the extreme. Defendant cannot urge, on the one hand, that the reports and testimony of Dr. Siegal and Dr. Kaufman should have been excluded as damaging impeachment of Dr. Klatte's testimony, because he would never have consulted those experts but for the prosecution's anticipated use of his illegal confession, yet argue, on the other, that he was denied an opportunity he otherwise would have taken to call those witnesses directly.

[36] CALJIC No. 2.10 provides: "There has been admitted in evidence the testimony of a medical expert of statements made by the defendant in the course of an examination of the defendant which were made for the purpose of [diagnosis] [treatment]. These statements may be considered by you only for the limited purpose of showing the information upon which the

truth, but only to evaluate the basis of Dr. Klatte's expert opinion. The error, he asserts, resulted in lowering the prosecution's burden of proof in violation of the Fifth Amendment, denied him his Sixth Amendment rights to confront the nontestifying experts, and contravened the Eighth Amendment's concern for heightened reliability in capital cases.

▮ No instructional error occurred under California law. While the trial court should give such an instruction upon request (Evid. Code, § 355; *People v. Dennis* (1998) 17 Cal.4th 468, 532–534 [71 Cal.Rptr.2d 680, 950 P.2d 1035]), it need not do so sua sponte. (E.g., *Montiel, supra,* 5 Cal.4th 877, 918; *People v. Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256].) Hence, failure to request such an instruction in the trial court forfeits a direct appellate claim that it should have been given. (*Ibid.*)

Defendant concedes he did not request a limiting instruction as such, but he asserts that, for two reasons, he may nonetheless complain of the instructional omission. First, he notes he *did* propose an instruction that evidence of the statements defendant made to Dr. Kaufman and Dr. Siegal should be *entirely disregarded.* (See text discussion, *ante,* at p. 461.) Even if this proposed instruction was too broad, he insists, it generated a duty in the trial court to fashion a correct, more limited substitute. (Cf., e.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1110 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826].)

However, the instruction defendant requested was premised on the theory that his statements to *particular* experts, Dr. Kaufman and Dr. Siegal, were the "tainted fruit" of defendant's illegal confession, and were thus inadmissible *for any purpose.* Neither defendant's proposed instruction, nor his argument that it be given, offered any hint of the completely different premise that *all* his statements to experts, including Dr. Klatte, should be *limited* to their proper *nonhearsay* uses.[37]

Defendant urges that such a request would have been futile, because the prosecutor, in opposing the proposed defense instruction, persuaded the trial court that defendant's statements to defense experts *were* admissible for all purposes, including as *substantive* evidence of his mental state. We disagree with defendant's complaint. While the prosecutor did make such an argument, and the trial court appeared at length to accept it, defendant was not

---

medical expert based [his] [her] opinion. This testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

[37] The proposed instruction provided: "You must disregard *for all purposes* testimony elicited from Dr. Ernest Klatte regarding statements [defendant] made to Dr. Kaufman and Dr. Siegal regarding [defendant's] history of drug abuse and any exhibit which reflects those statements. This information should not have been admitted into evidence and is hereby stricken." (Italics added.)

prevented from contradicting the prosecutor's view and proposing a more limited instruction. He simply failed to do so.

In any event, we discern no prejudice under any applicable standard. Defendant's strategy, in essence, was to tell his story through his expert witness—i.e., to persuade the jury he might have killed the Harbitzes while mentally impaired by drug ingestion, but to make that point without subjecting himself to cross-examination by taking the stand personally to describe his symptoms and reactions. Hence, insofar as they supported his claim, defendant wanted the jury to believe his hearsay statements, at least those he made to Dr. Klatte.

Had defendant testified, he presumably could have been impeached with inconsistent statements he gave to various doctors. By the same token, even if defendant's jury had been specifically instructed about the limited use it should make of defendant's hearsay statements to experts, the jury would nonetheless understand that it must evaluate the credibility of those statements in order to determine whether the experts' resulting opinions were soundly based.

Under these circumstances, the line between use of defendant's statements for their substantive "truth," on the one hand, and simply as the basis for doctors' diagnoses on the other, is subtle indeed. There is no reasonable basis to conclude the jury's guilt verdict would have been altered had the limiting instruction defendant now proposes been given. No ground for reversal appears.

### C. *Failure to instruct that Kennedy might be accomplice.*

Defendant urges that the court, sua sponte, should have instructed the jury to consider whether prosecution witness John Kennedy was an accomplice and, if so, that his testimony (1) should be viewed with distrust and (2) required corroboration by other evidence "tend[ing] to connect the defendant with the commission of the offense." (§ 1111; *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704] (*Zapien*).) Omission of such instructions, defendant insists, violated his Fifth and Sixth Amendment due process and fair trial rights, as well as his Eighth Amendment reliability interest in a capital trial.

The court need give such instructions only where there is substantial evidence that the witness was an accomplice. (E.g., *People v. Lewis* (2001) 26 Cal.4th 334, 369 [110 Cal.Rptr.2d 272, 28 P.3d 34] (*Lewis*); *People v. Frye* (1998) 18 Cal.4th 894, 965–966 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Gordon* (1973) 10 Cal.3d 460, 469–470 [110 Cal.Rptr. 906, 516 P.2d 298];

*People v. Bevins* (1960) 54 Cal.2d 71, 76 [4 Cal.Rptr. 504, 351 P.2d 776].) "An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant" (§ 1111) and does not include an accessory (§§ 31, 32; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]). "An accomplice must have ' "guilty knowledge and intent with regard to the commission of the crime." ' [Citation.]" (*Lewis, supra*, at p. 369.)

As indicated above, Kennedy testified he drove defendant to the Harbitzes' residence because defendant said he wanted to ask them how to contact their son William. Kennedy stated he parked the car at some distance from the Harbitz home, remained in the car while defendant went inside, never approached the house himself, waited until defendant returned, then drove away when directed by defendant to do so. Kennedy insisted he had no prior inkling of defendant's intent to kill and rob the Harbitzes, was not present at the murders, and did not participate in those crimes. The record contains no contrary evidence.

Defendant insists the jury could infer Kennedy's accomplice status because Kennedy shared drugs with defendant on the night of the murders, and thus also presumably shared defendant's need for drug money. Moreover, defendant notes, by his own admission, Kennedy "was involved with [defendant] at every step of the process leading up to the homicides," and the jury could infer he acted as a "lookout." Moreover, defendant points out that Kennedy helped him flee the crime scene, with apparent knowledge that he had engaged in criminal activity, and that Kennedy acknowledged he was initially arrested and charged with conspiracy, accessory to murder, and accomplice to murder.

We need not decide whether accomplice instructions should have been given on the premise that the jury could infer Kennedy was an aider and abettor, and thus an accomplice, of crimes committed against the Harbitzes. If error occurred, it was harmless by any applicable standard. Even where accomplice instructions were required, we have found no prejudice where, in fact, the witness's testimony was sufficiently corroborated. (*Zapien, supra*, 4 Cal.4th 929, 982.) " 'Such [corroborative] evidence "may be slight and entitled to little consideration when standing alone. [Citations.]" ' (*People v. Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) 'Corroborating evidence "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that [such] evidence be sufficient in itself to establish every element of the offense charged." [Citation.]' (*People v. Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163].)" (*Zapien, supra*, at p. 982.)

Here there was ample corroboration tending to connect defendant with the commission of the Harbitz murders. Cynthia Cornwell testified that defendant left the El Monte house with Kennedy, then later returned with him, on the night of the murders. Cornwell confirmed that defendant came home with a stab wound in his knee, then later hinted that he had been involved in a murder. The bloody Levi's recovered from defendant's house contained stains that matched both of the victims' blood. Thus, any error in failing to instruct on Kennedy's accomplice status was harmless.[38]

### D. *Unconsciousness as complete defense.*

The jury received instructions, among others, on robbery, both the premeditated and felony-murder forms of first degree murder, express- and implied-malice second degree murder, and voluntary and involuntary manslaughter. Defendant requested, and received, an instruction that if, while unconscious as the result of voluntary intoxication, he killed without malice or intent to kill, the crime was not murder, but involuntary manslaughter. The jury was also instructed, as to crimes requiring specific intent, that it must consider the effect of defendant's voluntary intoxication, if any, when determining whether he formed such intent. Finally, the jury heard it could convict defendant of voluntary manslaughter if he killed in the honest, though unreasonable, belief in the need for self-defense.[39]

Defendant now urges that the court erred by failing to instruct, sua sponte, on the *complete defense* of unconsciousness. He asserts that the error violated his Fifth and Fourteenth Amendment rights to have the jury consider every material fact presented by the evidence.

As the basis of his claim, defendant cites the California rule that, as a corollary of its duty to instruct on all principles closely and openly

---

[38] Defendant insists Kennedy was the sole witness tending to negate the defense theory that defendant, while hallucinating under the influence of drugs, attacked the Harbitzes in an honest, if unreasonable, belief in the need for self-defense and was thus guilty, at most, of voluntary manslaughter. There was no corroboration, defendant asserts, of Kennedy's testimony that defendant seemed sober, and acted rationally, both before he left the car to go into the Harbitz residence, and after he returned. Even were we to accept the dubious proposition that corroboration on these specific matters was required (see text discussion, *ante*), we conclude it was amply provided by Cornwell. She also testified that defendant seemed sober at all times she saw him on the evening of December 7, 1982. Moreover, the explanation he gave her for the wound in his knee (i.e., that he got into an argument with a loan shark) was inconsistent with his theory that he attacked the Harbitzes while in a delusional state. Finally, we note the concession by Dr. Klatte that, according to defendant's own statement, much of his activity on the night of the murders appeared goal-directed, i.e., to obtain money for drugs.

[39] The court refused an instruction, proffered by defendant, that made clear such an unreasonable belief could stem from defendant's "mental illness, voluntary intoxication, or both." However, the instruction actually given did not preclude the jury from so concluding.

connected with the facts of the case, and which are necessary for the jury's understanding of the case (*People v. Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]), the court must instruct on an affirmative defense, specifically including unconsciousness, even in the absence of a request, "if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

One cannot be guilty of a crime if he or she "committed the act charged without being conscious thereof." (§ 26, par. Four.) On the other hand, voluntary intoxication, even if it induced unconsciousness, is not a defense to crime as such, though it may be relevant to whether the defendant formed a specific intent necessary for its commission. (§ 22; see, e.g., *People v. Kelly* (1973) 10 Cal.3d 565, 572–573 [111 Cal.Rptr. 171, 516 P.2d 875]; *People v. Conley* (1966) 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911].) Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide. Hence, at the time defendant committed his crimes, where voluntary intoxication rendered the defendant unconscious, " 'criminal negligence [was] deemed to exist irrespective of unconsciousness,' " and the offense was involuntary manslaughter. (*People v. Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762].)[40] As noted above, the trial court instructed in accordance with these principles.

However, defendant urges there was substantial evidence, i.e., evidence from which a rational jury could conclude that he killed the Harbitzes while hallucinating, and thus unconscious, for reasons not related to the immediate effects of voluntary intoxication—including the *lingering* effects of *chronic* drug abuse[41] and past head injuries. He points to expert testimony that he was a chronic drug abuser, that the substances he habitually ingested could

---

[40] In 1995, section 22 was amended to provide prospectively that when the charge is murder, "voluntary intoxication is admissible solely on the issue . . . whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Stats. 1995, ch. 793, § 1, p. 6149.) Hence, depending on the facts, it now appears that defendant's voluntary intoxication, even to the point of actual unconsciousness, would not prevent his conviction of second degree murder on an implied malice theory, or of voluntary manslaughter based on his or her potentially lethal act, committed with "conscious disregard" for life, in response to provocation or as the result of an honest, though unreasonable, belief in the need for self-defense. (See *People v. Lasko* (2000) 23 Cal.4th 101, 107–113 [96 Cal.Rptr.2d 441, 999 P.2d 666]; *People v. Blakeley* (2000) 23 Cal.4th 82, 87–91 [96 Cal.Rptr.2d 451, 999 P.2d 675]; but cf. *People v. Wright* (2004) 35 Cal.4th 964 [28 Cal.Rptr.3d 708, 111 P.3d 973].)

[41] Defendant cites no California cases, and we have found none, that directly decide whether unconsciousness based on the lingering effects of chronic drug ingestion can be a complete defense to homicide, or any crime. In *Kelly, supra,* 10 Cal.3d 565, we concluded that an

produce long-term mental effects, including delusions and hallucinations, and that he had hallucinated on a previous occasion after suffering a motorcycle accident in which he hit his head. Defendant also notes John Kennedy's testimony that defendant seemed sober both immediately before and immediately after the Harbitz killings—thus suggesting, in defendant's view, that, while he was in the Harbitz home, he had a momentary "flashback" not related to the immediate intoxicating effects of recently ingested drugs.

We need not address whether the trial court erred by failing, sua sponte, to instruct on the complete defense of unconsciousness. We find that if error occurred, it was harmless by any applicable standard.

In the first place, very strong evidence suggested that defendant killed the Harbitzes, while conscious, in the course of a robbery. As Kennedy noted, defendant seemed mentally normal at all times during the evening of December 7, 1982. In particular, his activity following the homicides appeared entirely rational and goal-directed. When he saw a patrol car, he tried to deflect suspicion by pretending to wipe the rear window of Kennedy's vehicle. Defendant told Kennedy to drive away without attracting attention, directed Kennedy, who was in unfamiliar territory, back to the freeway, and began going through wallets he had retrieved from the Harbitz residence.

There is no evidence defendant told either Kennedy or Cynthia Cornwell, while the experience was still fresh, that he suffered hallucinations, delusions, or a temporary blackout while inside the house. Instead, to explain his knee wound, defendant lied to Kennedy that he had encountered "dope dealers that don't have no dope" and had to "hurt 'em." Defendant similarly lied to Cornwell that he had gotten into a fight with a loan shark.

Defendant's own experts were hardly enthusiastic in their support for his "hallucination" theory. Indeed, they carefully refrained from expressing any opinions that defendant actually hallucinated at the Harbitz residence. Dr. Klatte, the principal defense expert, indicated considerable skepticism on the issue, for multiple reasons. He acknowledged that defendant, who exhibited an antisocial personality, had a "loud and clear" capacity for malingering when it suited his purposes. Dr. Klatte's suspicions were further aroused by defendant's failure to mention hallucinations to him until many years after their initial interviews. Finally, Dr. Klatte conceded that much of defendant's activity on the night of the murders appeared goal-directed, i.e., to obtain money for drugs.

---

*insanity* defense could be based on such a theory, but we appeared to distinguish the defense of unconsciousness. (*Id.* at pp. 574–576.) Subsequently, the Legislature made clear, for purposes of crimes thereafter committed, that the *insanity* defense may *not* be based upon "an addiction to, or abuse of, intoxicating substances." (§ 25.5, added by Stats. 1994, 1st Ex. Sess. 1993–1994, ch. 10, § 1, p. 8562.)

The premise that hallucinations might have stemmed from a prior head injury was particularly flimsy. Dr. Klatte testified that, while defendant had hallucinated shortly after his motorcycle accident, it was not known whether the hallucinations were the result of the accident or of drug ingestion.

Finally, as noted above, the jury was instructed that "voluntary" intoxication warranted a verdict of involuntary manslaughter, rather than murder. While the instructions did not specify what the jury should do if it found he was unconscious for reasons *beyond his control*, such as brain damage, it is inconceivable the jury would believe that, in such a circumstance, it should (1) convict him of *murder*, a crime *greater* than manslaughter, then (2) find true special circumstances rendering him death-eligible, then (3) sentence him to death. (See *People v. Turner* (1990) 50 Cal.3d 668, 692–693 [268 Cal.Rptr. 706, 789 P.2d 887].) The only logical inference is that the jury rejected defendant's claim of unconsciousness entirely. Hence, an instructional failure to explain the jury's duty in the event it found *involuntary* unconsciousness can have caused no prejudice.[42]

E. *Failure to define unconsciousness.*

Defendant contends that, when instructing on unconsciousness by voluntary intoxication (CALJIC No. 8.47), the court erred by failing, sua sponte, also to instruct on the *legal definition* of unconsciousness.[43] Thus, defendant urges, the jury was deprived of learning that, for legal purposes, unconsciousness extends to those "who are not conscious of *acting* but who *perform acts while asleep or while suffering from a delirium of fever*," and (of particular importance, in defendant's view) "does not require that a person be incapable of movement." (CALJIC No. 4.30, italics added; see *People v. Saille* (1991) 54 Cal.3d 1103, 1121 [2 Cal.Rptr.2d 364, 820 P.2d 588].)[44]

[42] In light of the verdicts actually rendered by this jury, we are not persuaded to a contrary conclusion by our awareness that, in the first of the two guilt trials leading to the original death judgment, the jury (1) *was* instructed it could acquit defendant if he was unconscious for various involuntary reasons, including "[involuntary] drug-related flashback," (2) repeatedly asked if a "flashback" could be "involuntary" if the original drug ingestion was voluntary, (3) was advised, in essence, that a "flashback" caused by voluntary drug ingestion was itself voluntary, and (4) two days later, after complaining through the foreperson of one juror who "refuses to listen or discuss this case," announced it could not reach a verdict, thereby requiring a mistrial. Defendant's insinuation that the "flashback" issue must have caused the deadlock is pure speculation.

[43] The People urge the claim was forfeited by failure to request a clarifying instruction in the trial court. But this contention overlooks the exact nature of defendant's argument on appeal, which is that the court was required *on its own motion* to define a term with " ' "a technical [meaning] peculiar to the law." ' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

[44] CALJIC No. 4.30, which applies to the *complete* defense of unconsciousness *not* induced by voluntary intoxication, provides in pertinent part: "A person who while unconscious

We are not persuaded. Even "[a]ssuming . . . that 'unconscious' has a sufficiently legal, technical meaning to require a sua sponte instruction [citation]," the instructions as given adequately conveyed the concepts defendant here stresses. (*Clark, supra,* 5 Cal.4th 950, 1020.) Thus, CALJIC No. 8.47 itself advised that one who, "*while unconscious* as a result of voluntary intoxication, *killed* another human being without an intent to kill and without malice aforethought" is guilty of involuntary manslaughter, and that one who becomes voluntarily intoxicated "*to the point of unconsciousness . . .* assumes the risk that *while unconscious* [he] [she] will *commit acts* dangerous to human life or safety." (Italics added.) No reasonable juror could fail to understand from this instruction that one can perform acts while unconscious. (*Clark, supra,* at p. 1020; see also *People v. Hughes* (2002) 27 Cal.4th 287, 343–344 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*).)[45]

Nor, in the context of this case, was it necessary to advise the jury specially that one could be unconscious while acting in a "delirium." That defendant killed while hallucinating he was in the movie Halloween II was the essence of his defense. Under these circumstances, jurors receiving an instruction on unconsciousness would necessarily understand that it related to defendant's hallucination claim. No rational jury, having heard the trial evidence and an instruction permitting it to find that defendant killed while unconscious, would require further instructions to realize that it could accept defendant's hallucination claim as one of unconsciousness. No instructional error occurred.[46]

commits what would otherwise be a criminal act, is not guilty of a crime. [¶] This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause. [¶] Unconsciousness does not require that a person be incapable of movement."

[45] Defendant stresses that in *Clark,* where we reached a similar conclusion, the jury received *both* CALJIC No. 8.47 *and* CALJIC No. 4.31, the "presumption of unconsciousness" instruction, which advises that a reasonable doubt the defendant was conscious requires a finding of unconsciousness even if the defendant "acted as if he were conscious." As defendant notes, the instant jury did not receive CALJIC No. 4.31 or an equivalent instruction. But as we made clear in *Clark,* "[b]*oth* of these instructions unmistakably convey to a reasonable juror the information that defendant claims was missing from the instructions." (*Clark, supra,* 5 Cal.4th 950, 1020, italics added.)

[46] Defendant urges the prosecutor exploited the instructional "omission" in his remarks to the jury by saying, "I can just see an unconscious man opening up his sheath, pulling out a knife, opening up the knife and stabbing. I can just see an unconscious man doing that, *especially with the facts we have here.*" (Italics added.) In his responsive argument, defense counsel urged that opening and closing a knife is not a complex act, and that even sleepwalkers can perform motions. The prosecutor did not claim the law precluded a finding of unconsciousness. His fleeting suggestion, rebutted by defense counsel, that defendant's claim of unconsciousness was not convincing does not undermine the conclusion that the jury was not misled about what evidence permitted it to find unconsciousness.

### F. *Instruction on involuntary manslaughter as general intent crime.*

As noted above, the jury received a version of CALJIC No. 8.47, advising that if defendant, while *unconscious* as the result of voluntary intoxication, killed *without intent* to kill and malice, the crime is involuntary manslaughter, in that, when one voluntarily becomes intoxicated to the point of unconsciousness, he assumes the risk he will commit acts inherently dangerous to human life or safety, and the law thus implies criminal negligence. The jury was further instructed, under CALJIC No. 8.45, on a "misdemeanor manslaughter" theory of involuntary manslaughter, with three possible underlying misdemeanors—assault, assault with a deadly weapon or by means of force likely to produce great bodily injury, and battery with serious bodily injury.

Finally, upon prompting by the prosecutor, and without objection by the defense, the jury was instructed, under CALJIC No. 3.30, that involuntary manslaughter requires a union or joint operation of act or conduct and "general criminal intent," such that "[w]hen a person *intentionally* does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." (Italics added.)[47] In an oral extrapolation, the court explained that involuntary manslaughter "is no specific intent or mental state. In other words, . . . analogous to drunk driving[,] [if] you *do the act*, it's presumed that the particular *general intent* is there when you do the particular crime." (Italics added.)

Defendant now urges the trial court erred, and thereby violated his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, by instructing on involuntary manslaughter as a general *intent* crime where the theory of involuntary manslaughter was *unconsciousness* by voluntary intoxication. On the instant facts, he insists, this improper combination of instructions might have misled the jurors to conclude they could *not* convict him of involuntary manslaughter even if they believed he killed while unconscious due to voluntary intoxication. Thus, he claims, they were left with an unwarranted all-or-nothing choice between a murder conviction and complete acquittal.

In this regard, defendant reasons as follows: Involuntary manslaughter while voluntarily *unconscious* is necessarily based on the assumption that the defendant killed without any awareness of his or her lethal act, and thus without intent to commit it. In such cases, the mental element is criminal

---

[47] The clerk's transcript indicates that the defense joined in *requesting* the instruction. The record does not make clear whether this decision was a "conscious and deliberate" tactical choice, thus forfeiting, under the doctrine of "invited error," an appellate claim that the instruction was erroneous or misleading. (See, e.g., *Weaver, supra*, 26 Cal.4th 876, 970.)

negligence, not "intentionality." However, the instruction that involuntary manslaughter requires general criminal intent contradicted this premise by indicating that one cannot be guilty of involuntary manslaughter unless he or she *did* intend the act which produced the victims' death. Taken literally, the general intent instruction advised that if defendant killed the Harbitzes, but could not intend the lethal acts because he was unconscious due to voluntary intoxication, he was *not guilty* of involuntary manslaughter. This left jurors only a choice between convicting him of murder or acquitting him.

We are not persuaded. At the outset, we find no reasonable likelihood the instructions, fairly read, confused or misled the jury about the connection between unconsciousness due to voluntary intoxication and the appropriate homicide verdict. (See, e.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 421 [79 Cal.Rptr.2d 408, 966 P.2d 442] (*Ochoa*); *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*); cf. *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475].) After all, the jurors had before them an instruction expressly stating that if one kills unintentionally while unconscious as a result of voluntary intoxication, "the crime is involuntary manslaughter." They had also been instructed on the distinct theory of misdemeanor manslaughter, which was not dependent on unconsciousness. Under these circumstances, there seems little chance the jury would conclude that the instruction defining involuntary manslaughter as a general intent crime *negated* the instruction defining an unintentional homicide while unconscious from voluntary intoxication as involuntary manslaughter, and thus precluded such a conviction based on voluntarily induced unconsciousness.

Any such risk was further diminished by the trial court's oral modification of the instruction defining involuntary manslaughter as a general intent crime. Though the court gave the settled explanation of general intent as involving an *intent to do the act* made criminal, the court further indicated that such intent was presumed insofar as the defendant simply *did the criminal act*. As pertinent here, this amplification reconciled the "unconsciousness" and "general intent" instructions, making clear that one who was unconscious due to voluntary intoxication satisfied any general intent element of involuntary manslaughter by simply engaging in the conduct, while in that state, that caused the victims' deaths.

Even if error occurred, we find no prejudice by any applicable standard. The jury was provided with multiple opportunities to absolve defendant of crimes involving specific intent, such as robbery, and of murder, in favor of lesser homicide offenses, on the basis of his impaired mental state produced by voluntary intoxication, or for other reasons. The jury rejected all such available lesser homicide verdicts, including both involuntary and voluntary

manslaughter, found defendant guilty of robbery, and convicted him of two counts of first degree murder.

Moreover, as we have already observed, it is illogical to assume a jury, instructed that one who kills while "voluntarily" intoxicated is guilty only of involuntary manslaughter, would find such intoxication, and yet convict the defendant of the greater crime of murder, add special circumstances, and sentence him to death. The only rational inference is that the jury simply discredited defendant's claim he was unconscious when he killed the Harbitzes.

Under these circumstances, we are persuaded that no prejudice arose from the general intent instruction defendant challenges. No basis for reversal appears.

### G. *Cumulative guilt phase error.*

As noted, we have identified no clear errors affecting the guilt trial. Moreover, we have concluded that if any such errors did occur, they were undoubtedly harmless. We therefore reject defendant's claims of cumulative error.

## V. PENALTY ISSUES

### A. *Evidence of Compton murder.*

As aggravating evidence, at the penalty phase, of other violent criminal activity by the defendant (§ 190.3, factor (b)), the prosecution introduced evidence that 75-year-old Houston Compton was brutally stabbed to death in Fullerton on the evening of August 22, 1980. Compton's body, which had sustained numerous knife wounds, was found on the Fullerton College campus. His abandoned vehicle, containing substantial blood residue, was later located in Santa Monica.

To demonstrate that defendant was Compton's killer, the prosecution presented testimony of William Harbitz that on an August evening in 1980, he saw defendant wearing a bloody T-shirt; defendant, who had been drinking, said he had been in a knife fight. The prosecution also presented the testimony of Linda Weissinger, who, then 16 years old, had worked in August 1980 at a McDonald's restaurant on Leffingwell Road in Whittier. Weissinger indicated that, in a photo lineup conducted in May 1983, she positively identified defendant as the man wearing a bloodstained T-shirt who came to the drive-through window of the Whittier McDonald's around 10:15 p.m. on August 22, 1980, driving an old white car, and bought two hamburgers. The

prosecution showed that a receipt recovered from Compton's abandoned vehicle (a white Ford Fairlane from the early 1960's) was for two hamburgers purchased at the same Whittier McDonald's at 10:12 p.m. on August 22, 1980.

Defendant makes several related contentions concerning the admissibility, and sufficiency, of the Compton murder evidence. We find no basis to disturb the penalty judgment.

Defendant first urges at considerable length that the trial court wrongly denied him a so-called *Phillips* hearing (see *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423] (*Phillips*)), with presentation of live testimony by the parties, to determine, in advance of the penalty trial, whether evidence he committed the Compton murder was legally sufficient to present to the penalty jury.[48] In particular, defendant asserts, the court should have determined whether, because of improper pretrial lineup procedures, his due process rights would be violated by admission of Weissinger's crucial eyewitness identification.

Defendant further contends that Weissinger's testimony was constitutionally tainted by the pretrial lineup procedures, and should have been excluded from evidence. Moreover, he insists that, with or without her identification, the evidence he murdered Compton was legally insufficient.

Once before the beginning of jury selection, and again prior to the penalty phase, the trial court entertained in limine defense motions to withhold all evidence of the Compton murder from the penalty jury. Each time, the defense sought an evidentiary hearing as to whether Weissinger's anticipated identification testimony was tainted by improper pretrial lineup procedures, and whether the prosecution's proof that defendant committed this crime was sufficient to go to the jury.[49] On both occasions, the court received the prosecution's offers of proof and heard extensive argument. Without taking

---

[48] In *Phillips*, we admonished that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element" of other violent crimes the prosecution intends to introduce in aggravation under section 190.3, factor (b). (*Phillips, supra,* 41 Cal.3d 29, 72, fn. 25.)

[49] Both motions were made in writing and included points and authorities. The second motion, filed between the guilt and penalty trials, incorporated factual assertions made in the first, and urged that admission of the Compton murder evidence would violate Evidence Code section 352, as well as defendant's rights to due process, and a fair and reliable trial, under both the state and federal Constitutions. In his argument on the motion, counsel urged that upon a defense objection to the "relevance" of the Compton murder evidence (i.e., that there was insufficient competent evidence of defendant's involvement), the prosecution was obliged,

live evidence, it then ruled that the Compton murder evidence, including the testimony of Weissinger, could be admitted.[50]

As noted, defendant insists these procedures were inadequate to resolve his objections to the Compton murder evidence. However, we need not determine whether the trial court should have given greater attention, in limine, to the issues raised by defendant,[51] including whether Weissinger's identification was tainted by improper pretrial lineup procedures (see, e.g., *People v. Citrino* (1970) 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80] [where defendant objects to in-court identification, court must determine, as "preliminary fact," whether prosecution has carried burden of showing pretrial identification procedures were not unduly suggestive]). That is because we independently conclude in any event that (1) Weissinger's identification testimony at trial was not excludable as the tainted product of flawed lineups, and (2) the evidence that defendant murdered Compton was legally sufficient for consideration by the penalty jury. We address those issues in turn.

### 1. *Pretrial lineups.*

Given the August 22, 1980, receipt linking Compton's murderer to the McDonald's restaurant on Leffingwell Road in Whittier, there is little doubt that Weissinger, who was working at the McDonald's that night, observed the killer. The only issues concern Weissinger's identification of defendant as the man she saw.

As recounted above, Weissinger picked other men from live lineups, conducted in November 1980 and July 1981,[52] before she picked defendant from a photo lineup in May 1983. Subsequently, in October 1983, Weissinger tentatively identified defendant in a live lineup. The parties agree that the October 1983 lineup was conducted in the unwaived absence of defendant's counsel, and the penalty jury heard no reference to it. On two later occasions, in 1985 and 1991, Weissinger was shown the same photo array from which she had identified defendant in May 1983.

---

under Evidence Code section 403, to prove, in an evidentiary hearing out of the jury's presence, the "preliminary fact" of the relevance of this evidence. (See also Evid. Code, § 402.)

[50] When it denied the second motion, just prior to the penalty phase, the court did indicate that after the Compton murder evidence was presented to the jury, the court would entertain, if presented, a motion under section 1118 for relief akin to acquittal. No such motion was made.

[51] We note, of course, that *Phillips, supra,* 41 Cal.3d 29, did not *require* trial courts to conduct the hearings described in our opinion. (E.g., *Clair, supra,* 2 Cal.4th 629, 677–678.) Nor did we suggest that such hearings, if conducted, must include live testimony. Moreover, a trial court's decision to admit "other crimes" evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient. (See *id.* at pp. 676–677.)

[52] Apparently these lineups did not include defendant.

At trial, Weissinger testified that, although she took her time to decide, she ultimately was certain, when she picked a photo from the May 1983 array, that the picture she selected showed the man she saw at the McDonald's restaurant on the night of August 22, 1980. Weissinger confirmed that she so advised Detective Lewis, who was supervising the May 1983 photo lineup. The defense stipulated that the photo in question was defendant's. Neither the prosecutor nor defense counsel inquired specifically about any identification Weissinger made *after* May 1983. Neither counsel sought to confirm whether, at the time of the 1992 trial, Weissinger was *still* sure she had picked the right man in May 1983. Moreover, Weissinger was not asked to identify defendant in person as he sat before her in the courtroom, and she did not do so.[53]

Defendant urges that Weissinger's courtroom identification testimony was "tainted" by flaws in the lineup procedures. These defects, defendant insists, include the illegal live lineup of October 1983, from which defendant's counsel was absent (see *United States v. Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] (*Wade*)), and the unnecessary, unduly suggestive reshowing of the May 1983 photo array on two later occasions, in 1985 and 1991 (see *Manson v. Brathwaite* (1977) 432 U.S. 98 [53 L.Ed.2d 140, 97 S.Ct. 2243]; *Neil v. Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251]). Defendant argues that due process thus required exclusion of Weissinger's testimony because, under the multipronged "totality of circumstances" test established by the United States Supreme Court, the testimony did not possess sufficient indicia of reliability to overcome the corrupting effect of the improper lineups. (*Manson v. Brathwaite, supra,* at pp.110–114; *Neil v. Biggers, supra,* at pp. 199–200.)

However, no "taint" arising from improper lineups appears in Weissinger's carefully circumscribed testimony, which was confined to her May 1983 photo identification. Defendant does not suggest that, prior to May 1983, any efforts by the police to obtain an identification from Weissinger were unduly

---

[53] With respect to the May 1983 photo lineup, the following exchange occurred on direct examination: "Q Showing you what I've marked [exhibit] 65, were you shown this lineup? [¶] A Yes, I was. [¶] Q *Did* you pick out a—when were you shown this lineup, approximately? [¶] A I believe it was in 1983 or early '84 when I was working in Arcadia. [¶] Q Was that Detective Lewis? [¶] A Yes, it was. [¶] Q *Did* you pick somebody out of this lineup? [¶] A Yes, I did. [¶] Q *Were you sure*—[¶] A The man who drove the car that night is in this lineup. [¶] Q Which one is he? [¶] A This one. [¶] Q Pointing to number 4 . . . . [¶] Q Why don't you put your initials right under that picture that you just identified. *You did this some time ago as far as identifying a photograph?* [¶] A Yes." On cross-examination, defense counsel probed the degree of certainty Weissinger felt *at the time of her May 1983 identification.* Counsel also elicited that Weissinger was shown the same photo array again in 1985 and 1991. However, counsel did not ask whether Weissinger *reidentified* defendant at those times, or whether she was still sure the photo she identified in May 1983 showed the man she saw at the McDonald's in August 1980.

suggestive in a way that might cause her to misidentify defendant as the McDonald's customer she saw. Indeed, so far as appears, neither defendant's photo, nor his person, played any part in those efforts. Defendant criticizes the May 1983 photo lineup on grounds that Weissinger was shown pictures in a group, rather than sequentially. However, he cites no case authority for the proposition that a group photo array is, per se, unduly suggestive.

Defendant focuses on events that occurred *after* the May 1983 photo identification. He insists that the improper October 1983 live lineup conducted in counsel's unwaived absence, and the subsequent reshowing of the May 1983 photo array to Weissinger in 1985 and 1991, might have locked her into her May 1983 identification, and might actually have created false memories, hardening her sincere but mistaken belief in the accuracy of the identification she made at the earlier time.

As noted, however, Weissinger did not testify to anything that could have been affected by these subsequent events. She vouched only for the certainty of her May 1983 identification *at the time it was made*. This was an issue upon which both she and Detective Lewis could be effectively examined. Moreover, the jury could fully assess whether Weissinger's testimony, so limited and scrutinized, constituted persuasive evidence that defendant was the man she observed at McDonald's on August 22, 1980. Under these circumstances, there was no need for an independent assessment whether Weissinger's testimony should be excluded as unreliable. It was properly admitted.[54]

### 2. *Sufficiency of Compton murder evidence.*

Defendant claims that the evidence he murdered Compton was legally insufficient. The prosecution's failure to sustain its burden of proof, defendant insists, violated his due process and reliability interests under the Fifth, Eighth, and Fourteenth Amendments. (See *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156 [32 Cal.Rptr.3d 759, 117 P.3d 476]; *Ochoa, supra,* 19 Cal.4th 353, 413–414; *People v. Johnson* (1980) 26

---

[54] Weissinger's identification testimony was not rendered inadmissible as a result of the October 1983 live lineup conducted in counsel's absence, because that testimony rested on a basis independent of, and untainted by, the improper lineup. (*People v. Bustamante* (1981) 30 Cal.3d 88, 102–103 [177 Cal.Rptr. 576, 634 P.2d 927]; see *Wade, supra,* 388 U.S. 218, 240–242.)

Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) Evidence meeting this standard satisfies constitutional due process and reliability concerns. (*Carter, supra*, at p. 1156; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the prosecution, and must presume every fact the jury could reasonably have deduced from the evidence. (*People v. Carter* (2005) 36 Cal.4th 1215, 1257–1258 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*); *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].) Issues of witness credibility are for the jury. (E.g., *Ochoa, supra*, 19 Cal.4th 353, 414; *People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime. (See *People v. Anderson* (2001) 25 Cal.4th 543, 570–575 [106 Cal.Rptr.2d 575, 22 P.3d 347] (*Anderson*).) Moreover, a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court. (*People v. Cuevas* (1995) 12 Cal.4th 252, 263–275 [48 Cal.Rptr.2d 135, 906 P.2d 1290] (*Cuevas*), overruling *People v. Gould* (1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865]; see Evid. Code, § 1238.) Indeed, "an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification: '[T]he [out-of-court] identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. [Citations.] . . .' [Citations]." (*Cuevas, supra*, at p. 265.)

Here, though based primarily on Weissinger's out-of-court identification, the evidence that defendant murdered Compton was sufficient. Weissinger readily testified that, after careful consideration, she made a positive identification of defendant from a photo array as the McDonald's customer she saw on the night of the Compton murder. While Weissinger did not independently identify defendant in the courtroom, or confirm that she remained certain of her photo identification, she did not disavow it (see *Cuevas, supra*, 12 Cal.4th 252, 267–268), and she explained at length why she felt sure of her choice at the time she made it. There was nothing inherently improbable about the evidence she offered. (See, e.g., *People v. Lang* (1974) 11 Cal.3d 134, 139 [113 Cal.Rptr. 9, 520 P.2d 393].)

Defendant's counsel had a full opportunity to cross-examine Weissinger, not only about the actual degree of certainty of her photo selection, but about all aspects of the identification process, including the conditions under which she had observed the McDonald's customer, and the occasions on which, as Weissinger candidly admitted, she had identified other men. Defendant also presented expert testimony on factors affecting the accuracy of eyewitness identifications. Under these circumstances, the jury was able to evaluate the credibility of Weissinger's identification, and the weight her testimony deserved was for the jury to resolve. Moreover, William Harbitz provided some independent evidence of defendant's identity as Compton's killer by describing the incident, on an August 1980 evening, when defendant, wearing a bloodstained T-shirt, approached Harbitz and said he had been in a knife fight.

In sum, there was substantial evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that defendant was Compton's murderer. Accordingly, the jury was properly allowed to consider, in aggravation of penalty, whether defendant committed this crime.

B. *Defendant's statements to defense mental health experts as "fruit of the poisonous tree."*

In an argument similar to one made at the guilt phase, defendant urges that his penalty trial expert witness, Sally Forbes, was improperly impeached with the reports of Dr. Loomis and Dr. Kaufman, mental health professionals consulted by the defense prior to the original trial.

On cross-examination of Forbes, the prosecutor inquired if Forbes had considered whether defendant, in describing his childhood traumas, might be malingering as the result of an antisocial personality. In this regard, the prosecutor asked whether Forbes had read the reports of Dr. Loomis and Dr. Kaufman. Forbes responded that she had not done so recently, and if she read them earlier, she could not remember what they said. The prosecutor offered to refresh her recollection with her testimony from the prior trial.

At a sidebar conference, defense counsel objected, among other things, that the reports of Dr. Loomis and Dr. Kaufman would not be available but for the erroneous failure to suppress defendant's confession in the prior trial. The trial court ruled that Forbes could be confronted with reports she had considered.

In response to the prosecutor's questions, Forbes agreed Dr. Kaufman had diagnosed defendant with an antisocial personality. During additional cross-examination on the issue of malingering, Forbes acknowledged this is

always a concern with criminal defendants, but indicated the specificity of detail in defendant's claims of childhood sexual abuse indicated he was telling the truth. The prosecutor then inquired whether, in discussing the Harbitz killings with Forbes, defendant claimed amnesia and hallucinations. Forbes answered in the affirmative, noting that, while defendant sometimes said "he must have done it because he had the knife," at other times he claimed he absolutely could not remember, and he never flatly admitted "stabb[ing] those people."

At this point, the prosecutor asked whether Forbes "remember[ed] reading Dr. Kaufman's report where he felt that the hallucination was a likely fabrication." Forbes answered "[y]es." The prosecutor then inquired whether Forbes remembered reading Dr. Loomis's report, indicating that defendant had also claimed amnesia to Dr. Loomis. Again, Forbes said she had. The examination then moved on to other subjects.

Defendant insists that, because the defense decision to consult Dr. Loomis and Dr. Kaufman was a direct consequence of the original trial court's erroneous refusal to suppress his illegally obtained confession, their reports were "fruit of the poisonous tree" and could not properly be used for impeachment of Forbes. (Citing *James, supra,* 493 U.S. 307.) Their improper admission for that purpose, he posits, denied him his Eighth Amendment right to a reliable penalty judgment.

We reject the contention for reasons previously stated. Under general principles of evidence, Forbes could be impeached with reports of other experts she had considered in reaching her own conclusions. Even if the "impeaching" experts in this case were consulted solely because the original trial court refused to suppress defendant's confession—a dubious premise—their reports, voluntarily obtained by the defense, could be used to confront an expert witness whom the defense chose to present in a subsequent trial from which the illegal confession *was* excluded. In such circumstances, the impeaching evidence was sufficiently attenuated to dissipate any "taint" arising from the illegal procurement of defendant's confession, and the deterrent purposes of the exclusionary rule were outweighed by the interest in true and accurate evidence. (See discussion, *ante,* at pp. 458–464.)

In any event, we discern no prejudice by any applicable standard. The prosecutor's fleeting allusions to the reports of Dr. Loomis and Dr. Kaufman during the cross-examination of Forbes simply touched on issues of defendant's possible malingering, and his antisocial personality, that had been amply explored and acknowledged, under proper circumstances, by defense experts at both the guilt and penalty trials. Beyond reasonable doubt, these brief references could not have affected the penalty verdict.

## C. *Constitutionality of death penalty law.*

Defendant raises numerous challenges to the California death penalty scheme, in general and as applied to his case. Except as noted, we have rejected similar or identical claims many times in the past, and defendant establishes no ground for reconsidering our prior conclusions. We note below our pertinent rulings on these issues, as follows:

The homicide and death penalty statutes adequately narrow the class of first degree murderers eligible for the death penalty. The scheme is not overbroad because it permits capital exposure for many first degree murders, including unintentional felony murder. (*People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*); *Anderson, supra,* 25 Cal.4th 543, 601; *People v. Crittenden* (1994) 9 Cal.4th 83, 154–155 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Nor are the special circumstances overinclusive in number or scope. (*Stitely, supra,* at p. 573; *People v. Ray* (1996) 13 Cal.4th 313, 356 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

The death penalty law does not fail to genuinely narrow the death-eligible class, or result in arbitrary and capricious penalty decisions, insofar as it grants prosecutors discretion to choose, from among cases meeting the statutory standards, those in which the death penalty will actually be sought. (*People v. Nakahara* (2003) 30 Cal.4th 705, 722 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *Snow, supra,* 30 Cal.4th 43, 126; *Anderson, supra,* 25 Cal.4th 543, 601–602; *People v. Keenan* (1988) 46 Cal.3d 478, 505–506 [250 Cal.Rptr. 550, 758 P.2d 1081].)

The multiple-murder special circumstance (§ 190.2, subd. (a)(3)) is not constitutionally overbroad insofar as it encompasses a wide range of culpable conduct, theoretically including two accidental felony murders. Categorizing those who commit two or more murders subject to a single prosecution as especially deserving of the death penalty is not arbitrary or irrational, and it adequately narrows the pool of death-eligible offenders. (*People v. Boyette* (2002) 29 Cal.4th 381, 440 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

With respect to statutory aggravating and mitigating circumstances set forth in section 190.3 of the death penalty law, factor (a) ("[t]he circumstances of the [capital] crime . . . and the existence of any special circumstances") is not impermissibly vague or imprecise. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *Stitely, supra,* 35 Cal.4th 514, 574.) Nor is factor (b) (defendant's other violent criminal activity) unconstitutional insofar as it permits consideration of unadjudicated crimes. (*People v. Gray* (2005) 37 Cal.4th 168, 236 [33

Cal.Rptr.3d 451, 118 P.3d 496] *(Gray )*; *People v. Morrison* (2004) 34 Cal.4th 698, 729 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Because of the "catchall" provision of section 190.3, factor (k) (jury may consider in mitigation "[a]ny . . . circumstance which extenuates the gravity of the crime even [if] . . . not a legal excuse for the crime"), factors (d) (whether defendant committed offense while under "extreme" mental or emotional disturbance) and (g) (whether defendant acted under "extreme" duress or "substantial" domination) do not unconstitutionally inhibit consideration of mitigating evidence by implying that unless the conditions described are "extreme" or "substantial," the factors are not mitigating, or are aggravating. *(People v. Panah* (2005) 35 Cal.4th 395, 500 [25 Cal.Rptr.3d 672, 107 P.3d 790] *(Panah)*; *People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123] *(Prieto)*; *People v. Barnett* (1998) 17 Cal.4th 1044, 1178–1179 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

For similar reasons, factors (d) (whether "the offense was committed" under the influence of extreme mental or emotional disturbance) and (h) (whether, "at the time of the offense," defendant's ability to appreciate criminality was impaired by mental disease or defect, or intoxication) of section 190.3 do not inhibit consideration of mitigating evidence by implying that the conditions described must relate directly to defendant's culpability for the capital crime. *(People v. Maury* (2003) 30 Cal.4th 342, 439 [133 Cal.Rptr.2d 561, 68 P.3d 1] *(Maury)*; *Hughes, supra,* 27 Cal.4th 287, 405, fn. 33.)

The death penalty statute is not constitutionally deficient for failing to require "intercase" proportionality review, even though such review is provided to noncapital sentencees under the Determinate Sentencing Act. *(Pulley v. Harris* (1984) 465 U.S. 37, 50 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1182 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Cox* (1991) 53 Cal.3d 618, 690–691 [280 Cal.Rptr. 692, 809 P.2d 351]; *Allen, supra,* 42 Cal.3d 1222, 1285–1288.)

Execution by lethal injection is not, per se, cruel and unusual punishment. *(Gray, supra,* 37 Cal.4th 168, 237; *People v. Carter, supra,* 36 Cal.4th 1114, 1213; *Hughes, supra,* 27 Cal.4th 287, 406; *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Defendant's assertion that execution by lethal gas is cruel and unusual is not cognizable, given that current law provides for lethal injection unless the prisoner chooses lethal gas. By affirmatively electing lethal gas, he would waive any claim that this form of punishment violates the Eighth Amendment. *(People v. Bradford* (1997) 14 Cal.4th 1005, 1058–1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].)

Defendant's claim that the Department of Corrections (now part of the Department of Corrections and Rehabilitation) (Department) has not adopted required standards for the administration of lethal injection (§ 3604, subd. (a)) also is not cognizable, because alleged imperfections in the method of execution do not affect the validity of the death judgment itself. Defendant's attack on illegalities in the execution process that may or may not exist when his death sentence is carried out is premature. (*People v. Cornwell* (2005) 37 Cal.4th 50, 105–106 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*); *People v. Young* (2005) 34 Cal.4th 1149, 1234 [24 Cal.Rptr.3d 112, 105 P.3d 487] (*Young*); *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*).)[55]

### D. *Death penalty instructional issues.*

Defendant asserts that the penalty instructions given in his case were constitutionally and statutorily deficient in multiple respects. Again, we have frequently dismissed identical or similar arguments, and defendant fails to persuade that any of these issues deserve renewed reconsideration. Following are pertinent rulings on the arguments raised:

The trial court did not err in failing to instruct on "core adjudicative principles," including (1) the burden and standard of proof at the penalty phase; (2) the necessity for proof, and jury findings, beyond reasonable doubt (a) of every aggravating factor supporting a death verdict (aside from other crimes), (b) of every fact underlying each aggravating factor, (c) that aggravation outweighs mitigation, and (d) that death is the appropriate penalty; (3) the need for jury unanimity on each aggravating factor; and (4) the presumption of life over death. (*Gray, supra,* 37 Cal.4th 168, 236–237; *Stitely, supra,* 35 Cal.4th 514, 573; *Panah, supra,* 35 Cal.4th 395, 499; *People v. Smith* (2003) 30 Cal.4th 581, 641–642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *Maury, supra,* 30 Cal.4th 342, 440; *People v. Welch* (1999) 20 Cal.4th 701, 767–768 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).) Nor was it necessary to require a written statement of findings and reasons for the jury's penalty verdict. (*People v. Monterroso* (2004) 34 Cal.4th 743, 795 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *Jenkins, supra,* 22 Cal.4th 900, 1053.) Recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], have not altered our conclusions regarding necessary findings, burden of proof, or jury unanimity. (*Monterroso, supra,* at p. 795; *Prieto, supra,* 30 Cal.4th 226, 275.)

---

[55] We note that the validity of the lethal injection procedures used by the Department is the subject of current litigation in the United States District Court for the Northern District of California. (*Morales v. Hickman et al.* (2006) 415 F.Supp.2d 1037.)

The penalty instructions given in defendant's case were not deficient insofar as they failed (1) to clarify the phrase "whether or not" in various of the factors set forth in section 190.3 by specifying which factors are aggravating and which are mitigating (*Gray, supra,* 37 Cal.4th 168, 236; *People v. Jones* (2003) 30 Cal.4th 1084, 1123 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68]), (2) to delete "inapplicable" mitigating factors where, as here, the jury was told to consider only "applicable" aggravating and mitigating circumstances (*Gray, supra,* at p. 236; *Maury, supra,* 30 Cal.4th 342, 439–440), or (3) to limit the aggravating circumstances to those specifically enumerated in section 190.3 (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]; *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15]).

The definition of mitigation included in CALJIC No. 8.88, as given here,[56] did not fail to explain that concept adequately. (*Welch, supra,* 20 Cal.4th 701, 772–773.) We are not persuaded otherwise by defendant's citation to certain empirical research, not part of the current record and not subject to cross-examination, suggesting that substantial numbers of persons, given the standard instruction, misunderstand mitigation as limited to the circumstances of the capital crime. (*Ibid.*)

Furthermore, CALJIC No. 8.88, which permits a judgment of death only upon the jury's unanimous determination that aggravation is "so substantial" in comparison with mitigation as to "warrant[] death instead of life without parole," is not deficient on grounds that it fails to say expressly a life sentence is required if mitigation outweighs aggravation. (*People v. Smith* (2005) 35 Cal.4th 334, 370 [25 Cal.Rptr.3d 554, 107 P.3d 229]; *People v. Medina* (1995) 11 Cal.4th 694, 781 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Duncan* (1991) 53 Cal.3d 955, 978–979 [281 Cal.Rptr. 273, 810 P.2d 131].) Nor does CALJIC No. 8.88 improperly imply that death is *required* if aggravation outweighs mitigation. The instruction makes clear that death is *permitted* only if aggravation is "so substantial" compared to mitigation that death, rather than life without parole, is "warranted." (*People v. Smith, supra,* 35 Cal.4th at p. 370; *People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*).)

Having admonished the penalty jury to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for

---

[56] Defendant's jury was told, in the words of the 1989 revision to CALJIC No. 8.88, that "[a] mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."

which he is on trial," and to "disregard any [conflicting] instruction [from] the guilt or innocence phase of this trial," the court was not required to instruct the jury further to consider all sympathetic mitigating factors, mercy, and nonstatutory mitigating factors, nor was it required to caution expressly that the "anti-sympathy" instruction given only at the guilt phase (CALJIC No. 1.00) did not apply at the penalty phase. (*Panah, supra*, 35 Cal.4th 395, 497; *Lewis, supra*, 26 Cal.4th 334, 393; *People v. Bolin* (1998) 18 Cal.4th 297, 343–344 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Adcox* (1988) 47 Cal.3d 207, 265 [253 Cal.Rptr. 55, 763 P.2d 906].)

Having told the penalty jury it must choose, under California's capital sentencing law, between death and "life *without parole*," the court was not obliged to instruct further on the "true meaning" of life without parole. Any instruction that such a sentence guaranteed defendant's incarceration until his death would be inaccurate, considering the Governor's commutation and pardon powers. (*Arias, supra*, 13 Cal.4th 92, 172; *People v. Gordon, supra*, 50 Cal.3d 1223, 1277; *People v. Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37].) On the other hand, the meaning of "[l]ife without parole" is plain. (*Arias, supra*, at pp. 172–173, distinguishing *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] [requiring explanation, under particular circumstances, that "life imprisonment" as alternative to death penalty meant defendant would be ineligible for parole].) We are not persuaded otherwise by defendant's citation to certain "contemporary research," not part of the current record or subject to cross-examination, suggesting many jurors do not understand that life without parole actually means no possibility of parole.[57]

Though defendant was free to argue residual doubt about his degree of culpability in the Harbitz homicides, the trial court had no obligation, let alone a sua sponte obligation, to instruct the penalty jury specifically that it could consider in mitigation any "lingering doubt" about defendant's degree of guilt. The federal Constitution does not require a "lingering doubt" instruction. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320].) Moreover, the concept is adequately covered in the standard instruction, given here, that the jury could consider, in mitigation, any extenuating circumstance of the crime, even if not a legal excuse therefor, and any sympathetic or other aspect of defendant's character or record he offered as a basis for a sentence less than death, whether or not related to the capital crime. (*People v. Harris* (2005) 37 Cal.4th 310, 359 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Musselwhite* (1998) 17 Cal.4th 1216,

---

[57] In any event, although the court on one occasion referred simply to "life without parole," at two other points in the instructions it specified that the penalties available were "death or confinement in [the] state prison for life *without possibility of parole*." (Italics added.)

1272 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*).)

### E. *Death sentence as disproportionate to individual culpability.*

Defendant insists his death sentence is disproportionate to his individual culpability, and thus violates state and federal constitutional provisions against cruel and/or unusual punishment. In assessing such a claim, we must examine the circumstances of the crime, as well as the defendant's personal characteristics. (*Panah, supra*, 35 Cal.4th 395, 501.) If, given these factors, "the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], [we] must invalidate the sentence as unconstitutional." (*People v. Lucero* (2000) 23 Cal.4th 692, 739–740 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

Defendant, acting alone, robbed and brutally murdered an elderly couple who had shown kindness to him. He was not a youth at the time of these offenses, and he had previously committed at least one other serious felony, an armed robbery. Defendant cites his difficult early childhood, leading to drug addiction, and the possibility he killed in a "panic," and in a misguided effort at self-defense, induced by his intoxicated state. However, the jury, on substantial evidence, essentially rejected this version of the homicides, and we may not substitute our judgment for the factfinder's. Moreover, though defendant's earliest years might have been deprived, he was adopted when still a young child by parents who showered him with wholesome love, attention, and support. His personal hardships pale in comparison to the gravity of his crimes. We cannot conclude that the penalty imposed is disproportionate to his culpability.

Defendant further urges that we have, and should exercise, authority under sections 1181, subdivision 7, and 1260 to reduce his death sentence to life imprisonment without possibility of parole. But we have concluded we may not, under these statutes, disturb the jury's penalty determination absent prejudicial error or legal insufficiency of evidence. (*Hines, supra*, 15 Cal.4th 997, 1080.)

### F. *Conflict of interest.*

Defendant claims his "convictions, death sentence, and confinement violate the state and federal [C]onstitutions in that he has been represented on appeal by counsel burdened by an unconstitutional conflict of interest." Defendant urges that an inherent conflict arises where, as here, his appointed appellate counsel has also been appointed to represent him in habeas corpus proceedings. But while habeas corpus counsel might have a conflict when investigating issues of his or her own ineffective appellate representation, no reason

appears why counsel's dual role would interfere with his or her effective representation on appeal. Moreover, a claim that habeas corpus counsel is burdened by an unconstitutional conflict of interest is not cognizable on appeal; it lacks merit in any event because there is no constitutional right to the effective assistance of counsel in state habeas corpus proceedings. (*Young, supra,* 34 Cal.4th 1149, 1232; *People v. Kipp* (2001) 26 Cal.4th 1100, 1139–1140 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see *Coleman v. Thompson* (1991) 501 U.S. 722, 756–757 [115 L.Ed.2d 640, 111 S.Ct. 2546].)

### G. *Delayed execution.*

Noting that he was first convicted and sentenced to die in 1984, defendant urges that his long confinement on death row awaiting execution constitutes cruel and unusual punishment. He observes that the delay stems from matters chargeable solely to the state—in particular, the need for a retrial after his illegal confession was erroneously admitted in the original trial, and the four-and-one-half-year wait for appointment of counsel to represent him in the current appeal. We have consistently rejected the contention that the delays inherent in the capital appeal process render the death penalty, or the process leading to it, cruel and unusual. (E.g., *People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *Anderson, supra,* 25 Cal.4th 543, 606; *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29].) We do so again.

### H. *Cumulative penalty phase error.*

Defendant urges that the cumulative prejudicial effect of errors at his penalty trial requires reversal of the death judgment. The contention fails because we have identified no error under state or federal law at the penalty phase of the trial.

### I. *International law.*

Defendant claims that, because of the due process violations he suffered throughout the guilt and sentencing phases of his capital trial, he was "denied his right to a fair trial by an independent tribunal, and his right to the minimum guarantees for the defense under customary international law as informed by the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the American Declaration of the Rights and Duties of Man." We have consistently held that international law does not prohibit a death sentence rendered in accordance with state and federal constitutional and statutory requirements. (*Panah, supra,* 35 Cal.4th 395, 500; *Hillhouse, supra,* 27 Cal.4th 469, 511.) Applying those standards, we have found no errors under state or federal law whose cumulative effect

was prejudicial. Hence, defendant has no basis for his claim of international law violations. (*Cornwell, supra,* 37 Cal.4th 50, 106; *People v. Blair* (2005) 36 Cal.4th 686, 755 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied July 19, 2006.